FILED
IN COURT OF COMMON PLEAS
DEFIANCE COUNTY, OHIO
01/23/2023 02:47 PM
AMY M. GALBRAITH, CLERK

**IN THE COURT OF COMMON PLEAS**
**DEFIANCE COUNTY, OHIO**

| | | |
|---|---|---|
| **COMMERCE DRIVE HOLDING ONE, LLC** <br> c/o NAI Harmon Group <br> 4427 Talmadge Rd., Suite A <br> Toledo, OH 43623 <br><br> Plaintiff, <br><br> -vs- <br><br> **APACKAGING GROUP, LLC.** <br> c/o Helga Arminak, Registered Agent <br> 1350 Mountain View Circle <br> Azusa, CA 91702 <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO. <br><br> JUDGE <br><br> **COMPLAINT** <br><br> Brandon M. Rehkopf (0089374) <br> Howard B. Hershman (0020986) <br> Kevin C. Urtz (0096100) <br> MOCKENSTURM, LTD. <br> 1119 Adams Street, First Floor <br> Toledo, OH 43604 <br> (419) 724-3499 Phone <br> (419) 724-3495 Fax <br> brandon@mockltd.com <br> howard@mockltd.com <br> kevin@mockltd.com <br><br> *Counsel for Plaintiff,* <br> *Commerce Drive Holding One, LLC* |

Now comes Plaintiff, Commerce Drive Holding One, LLC, by and through its undersigned counsel, and for its Complaint alleges and avers as follows:

## PARTIES AND JURISDICTION

1. Plaintiff, Commerce Drive Holding One, LLC (hereafter "Plaintiff"), is an Ohio limited liability company licensed to transact business in the State of Ohio, with its principal place of business in Defiance, Ohio.

2. Defendant, Apackaging Group, LLC (hereafter "Defendant"), is a California limited liability company, with its principal place of business in Azusa, California.

**EXHIBIT 1**

3. This Court has personal jurisdiction over Defendant based upon its continuous conduct of business within the State of Ohio.

4. Defendant also is subject to the jurisdiction of this Court based on the forum selection clause contained in Section 41 of the Lease Agreement executed by the parties.

5. Venue properly lies in this Court pursuant to the agreement of the parties and because Defendant conducts business in Defiance County, and the events or omissions giving rise to Plaintiff's claims occurred within Defiance County.

## **FACTUAL HISTORY**

6. Plaintiff realleges and incorporates by reference the allegations made in the foregoing paragraphs as if fully rewritten herein.

7. Plaintiff is the owner of certain real property improvements, including the warehouse and manufacturing facility, located at 25925 Commerce Drive, Defiance, OH 43512 (hereafter "the Premises").

8. Plaintiff is party to a ground lease with the real property owner, Defiance Harmon, LLC, an Ohio limited liability company, which allowed for Plaintiff to develop the warehouse and manufacturing facility upon the Premises.

9. On or about August 30, 2021, the parties entered into a written Lease Agreement (hereafter "the Agreement"), whereby Defendant agreed to lease a portion of the Premises from Plaintiff upon the terms and conditions contained in the Agreement. A true and accurate copy of the Agreement is attached hereto as **Exhibit "A"**.

10. The Lease is for a newly developed warehouse and manufacturing facility that was custom designed to meet Defendant's needs.

11. Plaintiff, as Landlord, provided Defendant an improvement budget of $2,412,850.00 to customize the warehouse to Defendant's needs ("Tenant Improvements").

12. This improvement budget is amortized and repaid over the life of the lease.

13. Pursuant to Section 53 of the Agreement, Defendant is required to immediately reimburse Plaintiff for any Tenant Improvement costs exceeding the $2,412,850.00 budget.

14. Plaintiff has incurred Tenant Improvement overages in the amount of $159,724.00.

15. The foregoing Tenant Improvement overages are documented on the Tenant Improvement Summary dated July 18, 2022, which was provided to Defendant. A copy of the Tenant Improvement Summary is attached hereto as **Exhibit "B"**.

16. Payment was due by August 18, 2022.

17. To date, Defendant has not paid the overage as required by the Lease.

18. Plaintiff contracted with Logan Creek Construction as its general contractor to build the warehouse and other improvements.

19. In addition to the improvements contracted for by Plaintiff, Defendant separately contracted with Logan Creek Construction to complete additional improvements at the Premises.

20. Defendant requested quotes from Logan Creek Construction for certain improvements that were separate from Plaintiff's construction agreement with Logan Creek Construction.

21. Logan Creek Construction sent quotes to Defendant, which Defendant then executed. Defendant then sent its own Purchase Orders to Logan Creek Construction. Copies of

the proposals signed by Defendant and Purchase Orders submitted by Defendant are attached as **Exhibit "C"**.

22. Each signed quote and purchase order act as a separate independent contract between Defendant and Logan Creek Construction.

23. Defendant contracted with Logan Creek Construction for a total of $2,690,206.53 in improvements to the warehouse.

24. Defendant failed to pay for a portion of the outstanding work performed by Logan Creek Construction, totaling $861,117.16.

25. All work under the purchase orders should have been paid in full by Defendant on or before August 25, 2022.

26. Due to Defendant's failure to timely pay the work orders of Logan Creek Construction, Plaintiff stepped in and paid the outstanding balance pursuant to Section 19 of the Agreement.  Plaintiff maintains this right under the Lease in order to prevent mechanic's liens from encumbering title to the property.  The payments issued by Plaintiff to satisfy this arrearage are attached to the Complaint as **Exhibit "D"**.

27. Plaintiff has made numerous demands of Defendant to pay the foregoing amounts owed; however, Defendant has failed to make any payment.

28. Defendant currently owes Plaintiff the sum of One Million Twenty Thousand Eight Hundred Forty-One and 16/100 Dollars ($1,020,841.16).

29. Plaintiff sent Defendant a Notice of Default of Lease on December 14, 2022, in which Plaintiff identified the foregoing defaults and amounts owed and demanded that Defendant cure said defaults by December 20, 2022. A copy of the Notice of Default is attached hereto as **Exhibit "E"**.

30. Plaintiff granted Defendant an extension of this deadline until January 5, 2023.

31. To date, Defendant has not made any payment to Plaintiff for the foregoing amounts owed pursuant to the Agreement.

32. Pursuant to Section 32 of the Agreement, Defendant also owes to Plaintiff interest on any outstanding amount owed at the rate of ten percent (10%) per annum, in addition to Plaintiff's reasonable attorney fees and costs.

**FIRST CLAIM**
**BREACH OF CONTRACT**

33. Plaintiff realleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully rewritten herein.

34. On or about August 30, 2021, Plaintiff and Defendant entered into a written Lease Agreement, whereby Defendant agreed to lease certain property from Plaintiff upon the terms and conditions contained in the Agreement.

35. Plaintiff has performed all of its duties and obligations under the Agreement.

36. Defendant has breached the parties' Agreement by, among other ways, failing to make timely payment of the construction overages related to is Tenant Improvement budget, and failing to make timely reimbursements to Plaintiff for the work orders that it separately ordered and incurred in relation to the Premises, but failed to pay.

37. Plaintiff has communicated with Defendant on multiple occasions regarding its breach of the Agreement and default under the terms of the Agreement.

38. Despite Plaintiff's communications with Defendant and demands for payment, Defendant has failed to make any payment toward the amounts owed.

39. As a direct and proximate result of Defendant's breach of the Agreement, Plaintiff has suffered damages in the amount of One Million Twenty Thousand Eight Hundred

Forty-One and 16/100 Dollars ($1,020,841.16), plus interest, attorney fees and other costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Commerce Drive Holding One, LLC, requests judgment and damages against Defendant, Apackaging Group, LLC, as follows:

a. Judgment in the amount of One Million Twenty Thousand Eight Hundred Forty-One and 16/100 Dollars ($1,020,841.16);

b. An award for reasonable attorneys' fees and costs, including but not limited to expert witness fees and court costs;

c. An award of pre and post judgment interest on any awards at the rate of 10% per annum, or the highest rate allowed by law; and

d. Any such other and further relief as this Court deems just and appropriate.

Respectfully Submitted,

*/s/ Kevin C. Urtz*
Brandon M. Rehkopf (0089374)
Howard B. Hershman (0020986)
Kevin C. Urtz (0096100)
MOCKENSTURM, LTD.
1119 Adams Street, First Floor
Toledo, OH 43604
(419) 724-3499 Phone
(419) 724-3495 Fax
brandon@mockltd.com
howard@mockltd.com
kevin@mockltd.com

*Counsel for Plaintiff,*
*Commerce Drive Holding One, LLC*

## **PRAECIPE**

**TO THE CLERK:**

Please transmit by certified mail, return receipt requested, and first-class mail, a copy of this Complaint to Defendant:

APACKAGING GROUP, LLC
c/o Helga Arminak, Registered Agent
1350 Mountain View Circle
Azusa, CA 91702

*Kevin C. Urtz*
Kevin C. Urtz (0096100)
MOCKENSTURM, LTD.

*Counsel for Plaintiff,*
*Commerce Drive Holding One, LLC*

# Exhibit "A"

### LEASE AGREEMENT

BETWEEN

**Commerce Drive Holding One, LLC,**
**an Ohio limited liability company**
**Landlord**

AND

**Apackaging Group, LLC**
**A California limited liability company,**
**Tenant**

Dated: August  30 , 2021

1

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (the "Lease") is made as of August ___30___, 2021, ("Effective Date") by and between **Commerce Drive Holding One, LLC**, an Ohio limited liability company (herein called "**Landlord**"), and **Apackaging Group LLC**, a California limited liability company (herein called "**Tenant**"). Landlord and Tenant are also sometimes referred to herein, collectively, as the "**Parties**," or individually as a "**Party**".

### FUNDAMENTAL LEASE PROVISIONS

Certain Fundamental Lease Provisions are presented herein and represent the agreement of the parties hereto, subject to further definition and elaboration elsewhere in this Lease:

(a)  Tenant's Trade Name: Apackaging Group or APG

(b)  Term:  10 Years and Two Months

(c)  Premises:  Approximately 80,000 square feet, once built, at the Harmon Business Park in Defiance, Ohio.

(d)  Commencement Date:  Commencement Date shall be January 1, 2022. Base Rent and Additional Rent will commence sixty (60) days after the Commencement Date ("Rent Commencement Date") on March 1, 2022.

(e)  Base Rent:

| Period | Annual Amount | Monthly Amount | Square Foot Rate |
|--------|---------------|----------------|------------------|
| Months 1-2 | N/A | $0 | $0.00/sf |
| Months 3-14 | $460,000.00 | $38,333.33 | $5.75/sf |
| Months 15-26 | $469,600.00 | $38,133.33 | $5.87/sf |
| Months 27-38 | $479,200.00 | $39,933.33 | $5.99/sf |
| Months 39-50 | $488,800.00 | $40,733.33 | $6.11/sf |
| Months 51-62 | $498,400.00 | $41,533.33 | $6.23/sf |
| Months 63-74 | $508,800.00 | $42,400.00 | $6.36/sf |
| Months 75-86 | $519,200.00 | $43,266.67 | $6.49/sf |
| Months 87-98 | $529,600.00 | $44,133.33 | $6.62/sf |
| Months 99-110 | $540,000.00 | $45,000.00 | $6.75/sf |
| Months 111-122 | $551,200.00 | $45,933.33 | $6.89/sf |

(f)  Additional Rent:  Tenant will pay all taxes, insurance, utilities, and operating costs.

(g)  Permitted Use:  The Premises shall be used and occupied as a plastics manufacturing plant and warehouse.

(h)  Notices:

Landlord:

**Commerce Drive Holding One, LLC**
c/o NAI Harmon Group
4427 Talmadge Rd., Suite A
Toledo, Ohio  43623

2

with a copy to:

Mockensturm Ltd.
1119 Adams Street
Toledo, OH 43604
Attn:  Brandon M. Rehkopf

<u>Tenant</u>:

Apackaging Group. LLC
1350 Mountain View Circle
Azusa CA

with a copy to:
Gordon Rees Scully Mansukhani LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111
Attention: Mark Posard

WITNESSETH:

1.    REFERENCES.  Each reference in this Lease to any of the Fundamental Lease Provisions shall be construed to incorporate all of the terms provided for under such provisions, and such provisions shall be read in conjunction with all other provisions of this Lease applicable thereto.

2.    PREMISES.  For and in consideration of the rents, covenants and agreements hereinafter reserved and contained on the part of Tenant to be observed and performed, Landlord leases to Tenant, and Tenant leases and agrees to accept from Landlord certain premises constituting a portion of the property tentatively known as the Harmon Business Park located in Defiance, Ohio, or such other name as Landlord may designate from time to time, as more particularly shown on Exhibit A attached hereto.  The Premises are demised and leased subject to all zoning ordinances, laws, ordinances, orders, regulations, rules or requirements of any federal, state, city, county or other governmental, public or quasi-public authority, or any department or bureau thereof, now existing or hereafter created (collectively, "Laws").

3.    AREA.  As used in this Lease, "Floor Area" means all areas designated by the Landlord for the exclusive use of a Tenant, as measured from the exterior surface of exterior walls and from the center of interior demising walls, and includes restrooms, mezzanines, warehouse or storage areas, clerical or office areas, and employee areas and break rooms within the Premises. Landlord and Tenant agree for all purposes hereunder that the Floor Area of the Premises is deemed to be 80,000 square feet.  Within sixty (60) days following the Commencement Date, either Party may elect to remeasure the Premises using a space measurement consultant, and such verification shall be made using the  BOMA 2019 for Industrial Buildings: Standard Method of Measurement (ANSI/BOMA Z65.2—2019) as a guideline. Landlord and Tenant acknowledge that the actual square feet of the Premises may change during construction and that the Parties will amend these descriptions in connection with such verification.

4.    TERM.

(a) The term ("Initial Term") of this Lease shall commence upon the Commencement Date and shall expire on February 29, 2032 (the "Expiration Date").  In the event that Tenant occupies the Premises prior to the Commencement Date pursuant to the Early Access period of Paragraph 4(c), then, other than the payment of Base or Additional Rent, all other obligations of Tenant set forth in this Lease shall be applicable throughout such period of occupancy prior to the Commencement Date.  For purposes of this Lease, "Substantial Completion" of Landlord's Work shall occur upon completion of construction of the portions of the Premises detailed on Exhibit D to this Lease, or when Tenant begins its operations, whichever should occur first.  If Substantial Completion is not achieved by December 31, 2021, then the Rent Commencement Date shall be delayed by one day for each additional day that Landlord requires to reach Substantial Completion.

(b)    Renewal Terms.

(i)    First Renewal Term.    If, at the expiration of the original Term, Tenant shall have fully performed all of its obligations hereunder, including payment obligations, Tenant shall have the option to extend this Lease an additional five (5) years ("First Renewal Term"), on the same terms and conditions, except for an increase in the Base Rent in the first year of the First Renewal Term of 2% and annual increases of two percent (2%) per year thereafter.

(ii)    Second Renewal Term.    If, at the expiration of the First Renewal Term, Tenant shall have fully performed all of its obligations hereunder, including payment obligations, Tenant shall have the option to extend this Lease an additional five (5) years ("Second Renewal Term"), on the same terms and conditions, except that Base Rent shall continue increase annually at two percent (2%) per year.

4

        (iii)    Notice of Exercise.    Tenant shall exercise the option to enter into both the First Renewal Term and, if applicable, the Second Renewal Term by giving written notice to Landlord at least six (6) months prior to the expiration of the Initial Term and First Renewal Term, as applicable.  Upon the extension of this Lease into the First Renewal Term and, if applicable, the Second Renewal Term, this Lease shall constitute a present demise for the Original Term, the First Renewal Term and the Second Renewal Term. The Original Term, First Renewal Term, Second Renewal Term and/or any other extensions thereof, shall hereinafter sometimes collectively be referred to as the "Term".

        (c)    Early Access.  Prior to the Commencement Date, but no later than October 15, 2021, Landlord shall provide Early Access to the Premises to Tenant so that Tenant may begin its Tenant Improvements and prepare for its operations ("Early Access Period").  Tenant understands that Landlord is still constructing the building and that Landlord cannot guarantee that all construction will be complete prior to the Early Access Period. During the Early Access Period, Tenant shall not be responsible for Base Rent or Additional Rent or Utilities.

### 5.    BASE RENT.

        (a)    Tenant covenants and agrees to pay to Landlord at the office of Landlord set forth above, or at such other place as Landlord may designate from time to time, without notice or demand therefor, and without any abatement, deduction, reduction, recoupment or set-off whatsoever, a fixed minimum rental ("Base Rent") as set forth on the Fundamental Lease Provisions which shall be punctually paid monthly in advance commencing on the Commencement Date and continuing thereafter on the first day of each succeeding calendar month throughout the Term.  If mailed, Minimum Rent and all other payments under this Lease shall be mailed in sufficient time and with adequate postage thereon to be actually received by Landlord not later than the due date.

        (b)    A pro rata monthly installment of Base Rent shall be due on the Commencement Date for the first month of the Term if the Commencement Date is a day other than the first day of a calendar month. A pro rata monthly installment of Base Rent shall be due on the first day of the last calendar month of the Term to cover rent for the last month of the term if the Term for any reason expires or terminates on a day other than the last day of a calendar month.  The pro rata calculation will be based on the actual days in the month of the Commencement Date.  For and with respect to each installment of Base Rent that is not paid within three (3) days of written notice, Tenant shall pay to the Landlord on demand, as Additional Rent, a late charge in an amount equal to five percent (5%) of the amount of the overdue payment for the purpose of defraying Landlord's administrative expenses relative to handling such overdue payment.

        (c)    No payment by the Tenant, or acceptance by the Landlord, of a lesser amount of Base Rent or Additional Rent than the full payment that shall be due from the Tenant to the Landlord shall be treated otherwise than as a payment on account.  The acceptance by the Landlord of a check (or electronic payment) for a lesser amount with an endorsement or statement thereon, or upon any letter accompanying such check, that such lesser amount is payment in full, shall be given no effect, and the Landlord may accept such check (or electronic payment) without prejudice to any other rights or remedies which the Landlord may have against the Tenant.

        (d)    Landlord understands that Tenant has requested another 40,000 sq ft be added to the Building. Landlord is willing to build this addition to the Building pursuant to terms of Section 54 below.  In the event that Landlord shall deliver this addition pursuant to Tenant's request, base rent shall adjust upon delivery in accordance with the terms of Section 54. Landlord shall deliver possession of the Premises (80,000 square feet) to Tenant in good working order, condition and repair, without defect and in compliance with all applicable laws, requirements of public authorities and requirements of insurance bodies on the Commencement Date.

6. **SECURITY DEPOSIT.** At the time of Tenant's execution of this Lease, Tenant shall deliver the sum of Thirty Eight Thousand Three Hundred Thirty Three Dollars and Thirty Three Cents ($38,333.33) (the "Security Deposit") to Landlord as security for the full, faithful, and timely performance of each and every provision of this Lease to be performed by Tenant. If Tenant defaults with respect to any provision of this Lease, including but not limited to the provisions relating to the payment of Rent, after notice and an opportunity to cure, Landlord may, in Landlord's discretion, use, apply, or retain all or any part of the Security Deposit for the payment of any Rent, or any other sum in default, or for the payment of any other amount which Landlord may spend or become obligated to spend by reason of Tenant's default, or to compensate Landlord for any other loss or damage which Landlord may suffer by reason of Tenant's default. If any portion of the Security Deposit is so used, applied, or retained, Tenant shall within 30 days after written demand deposit cash with Landlord in an amount sufficient to restore the Security Deposit to its original amount. Landlord shall not be required to keep the Security Deposit separate from its general funds, and Tenant shall not be entitled to interest on the Security Deposit. The Security Deposit shall not be deemed a limitation on Landlord's damages or a payment of liquidated damages or a payment of the Rent due for the last month of the Term. Landlord may deliver the Security Deposit to the purchaser of the Premises if the Premises are sold, and after such time, Landlord will have no further liability to Tenant with respect to the Security Deposit.

7. **USE OF PREMISES; COMPLIANCE WITH LAWS.** The Premises shall be used solely for the Permitted Use described in the Fundamental Lease Provisions and for no other use or purpose whatsoever, all in accordance with the Laws, and the requirements herein set forth.

In no event shall the Premises or any portion thereof be used in the following manner, nor for any of the following purposes: (i) any illegal use, (ii) in violation of any Laws or certificate of occupancy covering the Premises, (iii) any manner which creates or permits a nuisance or trespass, (iv) any manner which in the reasonable judgment of Landlord impairs or adversely affects the character, reputation or appearance of the Building, (v) any manner which obstructs or encumbers the sidewalks or other Common Areas of the Building, (vi) any hazardous or wasteful manner, (vii) any manner which exceeds the floor load which such floor was designed, or is permitted by law, to carry, (viii) an auction, fire, bankruptcy, discount, outlet store, going out of business sale or similar type sale, or for any unethical method of business, (ix) any manner which causes or permits any odors, fumes, dust or vapors to emanate or to be dispelled from the Premises, or (x) any form of lewdness, or any form of establishment employing partially or totally nude entertainers, employees or waiters or waitresses, or any usage as an adult entertainment facility, massage parlor, bathhouse, or facility or entertainment which caters to the prurient interests of patrons, including but not limited to, the depiction of "X-Rated" or sexually explicit conduct or nudity by movies, peep shows, live entertainment, or the sale of books, magazines, or other periodicals, or sex-centered objects.

Tenant shall comply with any and all provisions, recommendations and requirements of any fire, liability or other insurer affecting or covering the Premises, or any part thereof.

8. **LANDLORD'S AND TENANT'S WORK.**

Other than Landlord's Work as defined below, the space is to be delivered "As-Is", provided all utilities and existing systems required for Tenant's use are in good working condition and meet all applicable code requirements. Roof shall be free of leaks and watertight. Landlord shall also ensure the HVAC system in place is in good working order, per Tenant's use. Tenant shall be responsible for maintenance of and repairs to the HVAC units, but Landlord shall be responsible for replacement of the units. Landlord shall at its expense perform the construction work designated as Landlord's Work in Exhibit "C" attached hereto and made a part hereof ("Landlord's Work") in accordance with the provisions of this Article 8. Landlord and Tenant agree that the Building shall be 80,000 square feet (subject to remeasurement as set forth above) delivered on the Commencement Date and that Tenant has the option for an additional 40,000 square feet pursuant to Section 54 below. Notwithstanding any provision of this Lease to the contrary, Landlord represents and warrants that the Premises (including Landlord's Work therein), Building systems and Common Areas shall be delivered to Tenant in good working order, condition and repair, without defect and in compliance with all applicable laws, requirements of public authorities and requirements of insurance bodies in effect as of the Commencement Date, including, but not

6

limited to The Americans with Disabilities Act of 1990, 42 U.S.C. Section 12101 et seq., and the regulations issued pursuant thereto. Landlord shall guarantee that Landlord's Work shall be free from any defects in workmanship and materials for a period of not less than one (1) year from the date of completion thereof. Landlord represents and warrants that no hazardous materials have been used, stored or released on, under, or within the Premises or the property containing the Premises in violation of any applicable laws.

All additional work which is not part of the Landlord's Work but is necessary or desirable to prepare and fixture the Premises in order to open for business shall be performed by Tenant at Tenant's expense and shall be deemed to be Tenant's Work. Tenant shall employ only such duly licensed and insured professionals whose presence at the Premises will not result in any labor unrest, dispute, slowdown, strike or disharmony whatsoever by labor rendering or scheduled to render services at or within, or delivering goods or materials at the Premises, in which event Tenant shall immediately and permanently cease its use of the professional(s) whose presence at the Premises was the basis for such unrest, slowdown or strike.

Any disagreement between Landlord and Tenant with reference to the work to be performed by either pursuant to Exhibit "C" or whether such work has been properly completed shall be resolved by the decision of Landlord's licensed architect.

**9.** **CONDUCT OF BUSINESS.** Throughout the Term, Tenant shall continuously use and occupy all of the Premises for the business use described in the Fundamental Lease provisions, without interruption during such regular and customary business hours as such businesses are customarily kept open (unless prohibited by Law or requested by Landlord).

**10.** **USE COMMON AREAS.** Landlord grants to Tenant a non-exclusive right to use the entrances, exits, parking areas, sidewalks and other portions of the Common Area (as hereinafter defined) as they are or may be from time to time constituted and designated by Landlord for the common usage of Landlord and the tenants of the Building and their respective successors, assigns, employees, agents, customers, invitees and licensees.

"Common Area" shall mean, but not necessarily be limited to, (i) that part of the Premises on which no building is constructed for the sale or rental of merchandise or the rendition of services to the general public, (ii) all areas and space provided by Landlord for the common or joint use and benefit of tenants in the Premises (including any expansion thereof to adjacent and contiguous land) their employees, agents, customers and other invitees, including parking areas, access roads, driveways, retaining walls, landscaped areas, truck serviceways or tunnels, pedestrian walks, outside courts and curb cuts and (iii) all other portions of the Premises not leased or leasable to tenants. Off-site improvements (such as, by way of illustration only, access roads, traffic lights, private or public sewage treatment plants, sewer connections, pipes and appurtenances and basins for the retention of run-off waters) which are necessary to the operation of the Premises and which are required to be maintained by Landlord and shall be included in the definition of Common Area.

**11.** **COMMON AREA MAINTENANCE COSTS.** Tenant shall pay to Landlord as additional rent commencing on Rent Commencement Date and continuing on the first day of each calendar month in advance during the Term, Landlord's estimate of Tenant's Proportionate Share of the Common Area Maintenance Costs (the "CAM Charge"), which in this instance shall be 100% of the operating costs of the Premises ("Tenant's Proportionate Share").

"Common Area Maintenance Costs" shall mean the total costs and expenses incurred in operating, maintaining, repairing and replacing the Common Area including without limitation the costs and expenses of: painting; paving; lighting; electrical power; sanitary control; installing, maintaining, operating and repairing all sprinkler and suppression systems; removal and/or relocation of snow and ice, including removal of snow and ice from the rooftop of buildings in the Premises; removal and other treatment of trash, garbage and other refuse; cleaning and sweeping of the Common Area; gardening, maintenance and operation of underground sprinklers; landscaping; lighting; heating, ventilating and air conditioning (if applicable to the Common Area); fire protection; water and sewer charges; installing and renting of signs; maintenance, repair and replacement of utility systems

7

serving the Common Area, including water, sanitary sewer and storm water lines, electric and other utility lines and pipes; security costs; the cost of operating machinery and equipment owned in and used in the operation, policing, maintenance and repair of the Common Area or the rental charges for such machinery and equipment; all management fees and costs; the cost of personnel (including applicable payroll taxes, workmen's compensation insurance and disability insurance) to implement all of the foregoing,. Landlord may cause any or all of said services to be provided by an independent contractor or contractors. Common Area Maintenance Costs shall exclude the following: (i) expenses incurred for a specific tenant in the Premises, (ii) the cost of Landlord's Work, (iii) any expenses which are capital expenditures unless amortized over the useful life of the improvement, (iv) costs which are reimbursable by other tenants or insurance proceeds and (v) leasing commission and attorneys' fee involving disputes with other tenants.

At any time after the expiration of each calendar year during the Term, Landlord shall determine the total actual Common Area Maintenance Costs for such calendar year, together with the determination of Tenant's Proportionate Share thereof. In the event the amounts for such preceding calendar year paid by Tenant under this Article 11 shall be less than Tenant's Proportionate Share thereof, as so determined by Landlord, the deficiency shall be paid by Tenant to Landlord within thirty (30) days after notice of such determination, or, in the alternative, any payment made by Tenant under this Article 11 in excess of Tenant's Proportionate Share shall be credited to the next sums due from Tenant under this Article 11, unless at the end of the Term in which case there shall be a refund. Any delay or failure of Landlord in computing or billing shall not prejudice the right of Landlord to thereafter render bills (or correct bills previously submitted) for such period or any subsequent period, nor constitute a waiver of, nor in any way impair the continuing obligation of Tenant to pay Tenant's Proportionate Share of the CAM Charge.

12.     **TAXES.**

(a)     Tenant covenants and agrees to pay to Landlord, as additional rent, without offset or deduction, the sums computed in this Article 12 (the "Tax Charge").

(b)     The following definitions shall apply to this Article 12: (i) the term "Tenant's Proportionate Share" shall have the definition set forth in Article 11, and (ii) the term "Taxes" shall mean all real estate taxes, ad valorem taxes, assessments (including, without limitation, general and special assessments for public improvements or benefits whether or not commenced or completed during the Term), sanitary and trash removal assessments, water charges or sewer rents and any and all other taxes and assessments levied, assessed or imposed against the Premises to any portion thereof at any time whether general or special, ordinary or extraordinary, unforeseen or foreseen, of any kind and nature whatsoever, whether in lieu of or in addition to so called "real estate taxes" by any governmental authority together with interest paid on any installment payments.

Taxes shall also include any tax or excise on, or measured in whole or in part by, rents or gross receipts or any other tax however characterized unless in the nature of a franchise tax or a tax on Landlord's profit unless such franchise tax or tax on profits shall be in lieu of "so called" real estate taxes in which case such franchise taxes and taxes on profits shall be included in the definition of Taxes.

Except as may be expressly set forth above in this Article 12, Taxes shall not include: (a) any net income, excise, profits (other than a tax on gross profits), estate, inheritance, succession, gift, transfer, franchise, or capital stock tax or assessment upon Landlord; (b) any fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord failed to timely pay (except if same are imposed by reason of Tenant's default hereunder); or (c) any Taxes assessed to any residential parcels, or Taxes assessed and payable directly by other owners/lessees within the Premises.

(c)     Tenant shall pay to Landlord, as additional rent, throughout the Term, commencing on the Rent Commencement Date and continuing thereafter on the first day of each month in advance, such amount as Landlord shall estimate or determine to be equal to one-twelfth (1/12) of Tenant's Proportionate Share of the Taxes for the then current calendar and/or fiscal year as the case may be with respect to impositions which are part of the

8

Taxes. Upon final determination of the Taxes for such year, Landlord shall compute Tenant's Proportionate Share thereof, and a summary and copy of the bill shall be furnished to Tenant reflecting the actual amount of the Taxes for such year. In the event the additional rent paid by Tenant during the preceding period shall be in excess of Tenant's Proportionate Share, the excess shall either be credited against the next ensuing payments due from Tenant under this Article 12 or, at Landlord's option, refunded to Tenant; in the event the amount paid by Tenant shall be less than Tenant's Proportionate Share, then Tenant shall pay the remaining balance to Landlord within thirty (30) days after such notice is furnished. The notice so furnished to Tenant shall also include a computation of the estimated sums to become due from Tenant each month for the ensuing year under this Article 12 and the monthly payments to be made under this Article 12 shall be adjusted accordingly for such ensuing year.

        (d)     A pro rata installment of Tenant's Proportionate Share of such Taxes shall be due for the last year of the Term if the Term for any reason terminates on a day other than the end of the applicable fiscal year. The obligation of Tenant with respect to this Article 12 shall survive the expiration of the Term.

        (e)     Landlord may, at Landlord's option, contest any and all Taxes, and the cost for any such protest (including attorney's fees) shall be considered part of the Taxes.

        (f)     Any delay or failure of Landlord in computing or billing shall not prejudice the right of Landlord to thereafter render bills (or correct bills previously submitted) for such period of any subsequent period, nor constitute a waiver of, nor in any way impair the continuing obligation of Tenant to pay Tenant's Proportionate Share of such Taxes. Photostatic copies of bills for taxes submitted by Landlord to Tenant shall be conclusive of the actual amount thereof.

        (g)     Tenant agrees that Tenant shall be solely responsible for the payment of all franchise taxes, use and occupancy taxes, rental taxes (or taxes levied in lieu thereof) ("Additional Taxes") by the City, County and/or State in which the Premises are located, and Tenant shall promptly and timely remit all such all Additional Taxes resulting from the existence of this Lease or Tenant's use and occupancy of the Premises.

      **13.**    **UTILITIES AND SERVICES.**   Tenant shall during the term hereof pay all charges for all utilities, including, but not limited to, telephone, gas, electricity, water, or sewer utilities used in or on the leased premises and for the removal of rubbish therefrom (together, "Utilities") before they shall become delinquent and shall hold Lessor harmless from any liability therefrom. The utilities will be separately metered and Tenants covenants to arrange for Utility service in its own name and promptly pay all third-party Utility providers.

      **14.**    **REPAIRS AND MAINTENANCE BY LANDLORD.**   Landlord's only obligation with respect to the Premises shall be to make necessary roof repairs and structural repairs to the exterior walls, and other load bearing walls and foundation and slab of the Premises and replacement of the HVAC system. Landlord shall have no obligation whatsoever to perform any repair, replacement, or maintenance, or non-structural: (a) to any exterior or interior portions of any windows, doors, glass, plate glass, store fronts, locks, hardware, signs, or any casing frames, or caulking which support or surround same, or (b) arising out of any act or omission or negligence of Tenant, or any assignee, subtenant or concessionaire of Tenant, or their respective employees, agents, servants, invitees, licensees, visitors or contractors. Landlord's obligation to repair as set forth in this Article 14 is conditioned upon actual receipt by Landlord's Agent of written notice of the need for such repair, after receipt of which Landlord shall be obligated to commence such repair within a reasonable time. Tenant shall in no event be entitled to withhold or offset any payment of Minimum Rent or any other sum payable under this Lease due to any breach by Landlord of this Article 14 or any other provision of this Lease. Notwithstanding any provision of this Lease to the contrary, in the event that Tenant is prevented from using the Premises or any portion thereof for Tenant's normal and customary business operations for ten (10) consecutive business days as a result of (a) Landlord making or failing to make any repairs, alterations, or improvements in or to any portion of the Premises or the Building as required under this Lease, (b) the failure of any building systems maintained by Landlord, (c) lack of access to the Premises, or (d) to the extent within Landlord's control, the failure of Landlord to provide the services and utilities required under this Lease, then Tenant's obligation to pay base monthly rent shall be abated or reduced, as the case may

9

be, after expiration of such ten (10) business day period for such time that Tenant continues to be so prevented from using the Premises or portion thereof, in the proportion that the rentable area of the portion of the Premises that Tenant is prevented from using bears to the total rentable area of the Premises.

**15.** **REPAIRS AND MAINTENANCE BY TENANT.** Tenant shall keep and maintain the Premises and all buildings and improvements thereon and all portions thereof, throughout the Term in first class order, condition and repair, including, without limitation, all trade fixtures and other fixtures and equipment contained therein, all improvements and alterations made by Tenant, the exterior and interior portions of all windows, doors, glass, plate glass, store fronts, locks, hardware, signs, or any casing, frames or caulking which support or surround same, and all plumbing, sewage, sprinkler, electrical, heating, ventilating and air conditioning equipment and systems within and serving the Premises, and all interior walls, floors, and ceilings and loading dock delivery area including cleanliness, repairs, dock drains if loading dock exclusively serves the Premises. Any and all such repairs, replacements and maintenance shall be performed at Tenant's sole expense with materials and labor of the kind and quality equal or superior to the original work. Tenant shall keep in force at all times during the Term a standard maintenance agreement on all heating, ventilating and air conditioning equipment and provide a copy of said maintenance agreement to Landlord, which agreement shall require at least a semi-annual inspection of such equipment. Tenants shall also keep in force at all times during the Term a pest control agreement to keep the Premises free of vermin and other pests, and shall provide a copy of said agreement to Landlord.

In the event (a) Tenant fails to promptly repair, clean or maintain the Premises or any portion thereof as required hereunder, or (b) Landlord, in the exercise of its reasonable discretion, determines that emergency repairs, replacement, cleaning or maintenance for which Tenant is responsible are necessary, or (c) any repairs, cleaning or maintenance to the Premises are made necessary by any act or omission or negligence of Tenant, its agents, employees, subtenants, assignees, concessionaires, contractors, invitees, licensees, or visitors, then, in any of such events, then Landlord shall be entitled, (but not obligated) to perform or cause to be performed such repairs, cleaning, or maintenance without incurring any liability to Tenant for any damage caused thereby, and Tenant shall pay to Landlord upon demand, as additional rent, the cost thereof plus a charge of three percent (3%) of such costs and expenses to compensate Landlord for administration.

**16.** **TENANT FIXTURES.**

(a) Tenant, at Tenant's sole expense, shall maintain and repair all trade fixtures, lighting fixtures, store fixtures, floor coverings, signs, plumbing, shades and other fixtures and equipment necessary for the operation of Tenant's business. After completion of Tenant's Work, Tenant shall have the right to make changes to the interior of the Premises, the cost of which does not exceed, in the aggregate for any one Lease Year, the sum of Twenty Five Thousand Dollars ($25,000.00) and further provided that such changes (i) do not require a building permit, (ii) affect the structure of the Premises or the building systems in the Premises, and (iii) are not visible from the exterior of the Premises, without Landlord's approval, which shall not be unreasonably withheld, conditioned or delayed..

(b) Intentionally Deleted.

(c) Tenant shall pay Landlord, on demand, as additional rent, any and all expenses incurred by Landlord in removing personal property and cleaning or otherwise restoring the Premises to the condition in which Tenant is required to leave them, including, without limitation, court costs, reasonable attorneys' fees, and moving, transportation and cleaning charges. Ten (10) days following the termination or expiration of this Lease, Landlord may, at Landlord's option and without notice, retain all or any portion of personal property remaining in the Premises, or sell same at public or private sale without legal process, for such prices as Landlord may obtain, and apply the value of such property or the proceeds of such sale to any amounts due from Tenant under this Lease. Nothing contained herein shall constitute consent or authorization for Tenant to remain on or leave Tenant's personal property on the Premises after the expiration of the Term.

10

17.   **SIGNS.**   Tenant shall be allowed to place signage on the exterior of the Building with the prior written approval of Landlord which shall not be unreasonably withheld.  Tenant shall also be responsible for obtaining all governmental approvals for its signage.

18.   **ALTERATIONS.**   After the Commencement Date, except as otherwise provided in Article 16(a) hereof, Tenant shall not alter the Premises or any part thereof without first: (i) submitting to Landlord plans and specifications in reasonable detail of any proposed alterations, and (ii) obtaining Landlord's prior approval thereof, which shall not be unreasonably withheld, conditioned or delayed.

19.   **LIENS.**   Tenant shall promptly pay for all work, labor, services and materials furnished for any work, performed by or on behalf of Tenant, and Tenant shall not permit any mechanic's, materialmen's, or any other type of lien or claim of lien to be filed against the Premises by reason of or related to any work, labor, services or materials supplied or claimed to have been supplied to Tenant or anyone holding the Premises through or under Tenant.  Tenant shall deliver to Landlord prior to commencement of any construction at the Premises a building permit, if required by applicable Law.  Promptly following the completion of any construction at the Premises, Tenant shall deliver to Landlord a signed release of mechanic's liens from each contractor utilized for the construction work.  If any such mechanic's, materialman's, or other lien or claim of lien shall at any time be filed against or affecting Landlord, the Premises or the Building, Tenant shall indemnify and hold Landlord harmless from same and shall within twenty (20) days after notice of the filing thereof, cause such lien to be cancelled and discharged of record.  If Tenant shall fail to cause such lien to be cancelled and discharged within such twenty (20) day period, then in addition to any other right or remedy of Landlord, Landlord shall be entitled, but not obligated, to discharge such lien in any manner that Landlord shall reasonably determine, and the cost of so doing, including attorneys' fees, shall be repaid by Tenant to Landlord, as additional rent, immediately upon demand.

20.   **INSURANCE.**

(a)   From and after the Delivery Date and throughout the Term, Tenant shall pay to Landlord a sum equal to Tenant's Proportionate Share multiplied by the Insurance Costs (as defined below) for such year.  As a deposit towards said amount, Landlord shall provide the Tenant as annual estimate of the Insurance Costs per square foot per year (the "Insurance Charge"), which shall  be payable by Tenant in equal monthly installments as Additional Rent. The Insurance Charge shall be adjusted annually at the end of each fiscal year of the Building (the fiscal year shall be determined by Landlord), which adjustment shall be based upon Landlord's estimation of the Insurance Costs to become due.

(b)   Within a reasonable period of time after Landlord's determination of Landlord's insurance costs for any year, Landlord shall furnish to Tenant a statement showing (i) the insurance costs incurred by Landlord during such year, (ii) Tenant's Proportionate Share of same, i.e. Tenant's Proportionate Share multiplied by said insurance costs; and (iii) the credit or balance due, as the case may be, after applying the Insurance Charge paid by Tenant applicable to such year.  Any balance due to Landlord shown on such statement shall be payable by Tenant within thirty (30) days after delivery of the statement; and any balance due to Tenant shall be a credit against the next payments of Minimum Rent due Landlord (or shall be paid within thirty 30 days after its determination if after the expiration or termination of the Lease), after first deducting therefrom any due and outstanding Rent then owed to Landlord.

(c)   The "Insurance Charge" is Landlord's cost of procuring and maintaining: (i) commercial general liability insurance, including contractual liability coverage, covering bodily injury and property damage liability and, unless insured under a business automobile policy, automobile ownership, non-ownership and hired car liability; (ii) workers compensation and other statutory disability insurance as required by the state in which the Building is located covering all employees of the Landlord; (iii) property insurance covering the Building and its improvements of, by, owned or controlled by Landlord against "All Risks" of direct physical loss or damage including without limitation, fire, lightning, vandalism, terrorism, earthquake, sinkhole collapse, subsidence, flood, windstorm, collapse, debris removal, loss occasioned by operation of building laws including demolition and

11

increased cost of construction in an amount that Landlord deems sufficient to replace or reconstruct the insured buildings and improvements without deduction for physical depreciation, including resulting loss of rental income, and with such deductible amounts as the Landlord shall deem advisable. Such insurance will not include coverage on any property belonging to Tenant or improvements installed by Tenant (except that Landlord's insurance shall cover reconstruction to a so-called vanilla shell condition which shall include typical wall painting, floor covering, ceiling lights and tiles and one interior partition wall regardless of which party may have performed the initial installation of such) nor will it cover any resulting loss of use or loss of Tenant's business income. Landlord's insurance may also include such other or additional insurance (as to risks covered, policy amounts, policy provisions or otherwise) as Landlord deems appropriate and as are then commonly insured against with respect to similar properties in similar locations. Landlord's insurance may be provided under a so-called "blanket" policy covering other centers owned by or under Landlord's control.

(d)     Landlord makes no representation or warranty to Tenant that the amount of insurance to be carried by Tenant under the terms of this Lease is adequate to fully protect Tenant's interest. If Tenant believes that the amount of any such insurance is insufficient, Tenant is encouraged to obtain, at its sole cost and expense, such additional insurance as Tenant may deem desirable or adequate. Tenant acknowledges that Landlord shall not, by the fact of approving, disapproving, waiving, accepting, or obtaining any insurance, incur any liability for or with respect to the amount of insurance carried, the form or legal sufficiency of such insurance, the solvency of any insurance companies or the payment or defense of any lawsuit in connection with such insurance coverage, and Tenant hereby expressly assumes full responsibility therefor and all liability, if any, with respect thereto.

(e)     Tenant, at Tenant's sole cost and expense, shall obtain and maintain in effect, commencing with the Commencement Date and continuing throughout the Term, insurance policies providing for the following coverage: (i) standard "special form" property insurance against fire, theft, vandalism, malicious mischief, sprinkler leakage and such additional perils as now are or hereafter may be included in a standard extended coverage endorsement from time to time in general use in the State in which the Building is located, insuring Tenant's Work, Tenant's merchandise, trade fixtures, furnishings, equipment and all items of personal property of Tenant located in, on or about the Premises, (ii) a commercial general liability policy, naming Landlord, the property manager, and any mortgagee of the Premises as additional insureds, protecting against any and all claims for injury to persons or property occurring in the Premises and protecting against assumed or contractual liability under this Lease with respect to the Premises and the operations of Tenant and any subtenant of Tenant in, on or about the Premises, with such policy to be in the minimum amount of Two Million Dollars ($2,000,000.00) per occurrence, and with an aggregate limit of at least Three Million Dollars ($3,000,000.00); (iii) products liability insurance for merchandise offered for sale or lease from the Premises, including (if this Lease covers Premises in which food and/or beverages are sold and/or consumed) liquor liability coverage (if applicable to Tenant's business) and coverage for liability arising out of the consumption of food and/or alcoholic beverages on or obtained at the Premises, of not less than One Million Dollars ($1,000,000.00) per occurrence for physical injury and death and property damage; (iv) workers' compensation coverage as required by law, with employer's liability limits in the minimum amount of Five Hundred Thousand Dollars ($500,000.00); (v) with respect to alterations, improvements and the like required or permitted to be made by Tenant hereunder, contingent liability and builder's risk insurance in amounts satisfactory to Landlord.

(f)     All insurance policies herein to be procured by Tenant shall: (i) be issued by insurance companies, reasonably satisfactory to Landlord and authorized to do business in the State in which the Premises is located; (ii) be written as primary policy coverage and non-contributing with respect to any coverage which Landlord may carry; (iii) insure and name Landlord, Landlord's managing agent, any mortgagee of the Premises and any parties in interest designated by Landlord as additional insureds, as their respective interests may appear (except with respect to workers' compensation insurance); (iv) be primary and non-contributory and (v) contain, in the case of Tenant's property insurance coverage, an express waiver of any right of subrogation by the insurance company against Landlord, Landlord's managing agent and their respective agents, employees and representatives which arises or might arise by reason of any payment under such policy or by reason of any act or omission of Landlord, its agents, employees or representatives. With respect to each and every one of the insurance policies herein required to be procured by Tenant, on or before the Commencement Date and at least thirty (30) days before any such

insurance policy shall expire, Tenant shall deliver to Landlord a certificate of the insurer certifying that such policy has been issued, providing the coverage required by this Lease and containing the provisions specified herein, together with evidence of payment of all applicable premiums. The term "insurance policy" as used herein shall be deemed to include any extensions or renewals of such insurance policy. In the event that Tenant shall fail to promptly furnish any insurance coverage hereunder required to be procured by Tenant, Landlord, at its sole option, shall have the right after ten (10) days' prior written notice to Tenant to obtain the same and pay the premium therefor for a period not exceeding one (1) year in each instance, and the premium so paid by Landlord shall be immediately due and payable by Tenant to Landlord as additional rent.

(g)     Tenant shall not do or permit to be done any act or thing upon the Premises that will invalidate or be in conflict with any fire insurance policies covering the building containing the Premises or any part thereof, including the Common Area, or fixtures and property therein, or any other insurance policies or coverage referred to above in this Article 20; and Tenant shall promptly comply with all rules, orders, regulations or requirements relating to such insurance policies, and shall not do anything, or prevent anything to be done, in, on or about the Premises in violation of or in conflict with such insurance policies. If any act or omission of Tenant, its agents, employees or contractors shall result in any increase in the premium rates applicable to any such insurance policies carried by Landlord, or other increased costs to Landlord in connection therewith, then Tenant shall reimburse Landlord on demand as additional rent for the amount of any such increased rates or costs.

(h)     Waiver of Subrogation. LANDLORD AND TENANT HEREBY WAIVE AND RELEASE ANY CLAIM THAT EITHER OF THEM MAY HEREAFTER HAVE AGAINST THE OTHER ON ACCOUNT OF ANY DAMAGE TO THE PROPERTY OF THE WAIVING PARTY, EVEN IF SUCH DAMAGE SHALL BE DUE TO THE NEGLIGENT ACT OR OMISSION OF THE OTHER PARTY. LANDLORD AND TENANT SHALL EACH CAUSE THEIR RESPECTIVE PROPERTY INSURANCE POLICIES TO CONTAIN EITHER A WAIVER OF ANY RIGHT OF SUBROGATION THE INSURER OF ONE PARTY HERETO MAY ACQUIRE AGAINST THE OTHER PARTY HERETO BY VIRTUE OF PAYMENT OF ANY LOSS UNDER ANY SUCH INSURANCE OR AN ACKNOWLEDGMENT BY THE INSURER THAT THE FOREGOING WAIVER OF CLAIMS DOES NOT IMPAIR OR INVALIDATE SUCH POLICY OF INSURANCE.

## 21.     INDEMNITY OF LANDLORD

(a)     Except to the extent of Landlord's gross negligence, Tenant shall, and does hereby, indemnify, release and save harmless Landlord, and Landlord's partners, agents, officers, servants, employees, officers, attorneys, shareholders, directors, mortgagees and master lessors (collectively, "Landlord Group") from and against any and all suits, actions, judgments, damages, costs, expenses, and attorney's fees incurred in the defense of any actions or proceedings arising out of or related to any loss of life, bodily or personal injury, property damage, or other demand, claim or action of any nature arising out of or related to this Lease or any transaction or occurrence in, on, upon, near, or involving the Premises or the occupancy or use thereof.

(b)     Except to the extent of Landlord's gross negligence, in the event the Landlord or Landlord Group or any member thereof shall be made a party to any litigation (i) against Tenant or (ii) arising out of or related to the Premises or use or occupancy thereof by Tenant or any of its subtenants, assignees, invitees, licensees, employees, servants or agents, then Tenant shall indemnify, protect and save harmless the Landlord and Landlord Group therefrom and shall pay upon demand all damages, costs, settlement amounts (whether in the form of cash payouts or lease concessions) expenses and attorneys' fees arising out of or related thereto.

(c)     Anything in this Lease to the contrary notwithstanding, neither Landlord nor Landlord Group shall have personal liability hereunder and Tenant shall look solely to the estate and property of Landlord in the land and buildings comprising the Premises, the rents or other income from such property receivable by Landlord, or out of the consideration received by Landlord from the sale or other disposition of all or any part of Landlord's right, title and interest in the Premises, subject nevertheless, to the rights of Landlord's mortgagee, for the collection of any judgment or other judicial process arising out of any default or breach by Landlord with respect to any of the

terms of covenants of this lease to be observed or performed by Landlord, and no other assets of Landlord or Landlord Group shall be subject to levy, execution or other procedures for the satisfaction of Tenant's remedies.

(d)  Neither party shall be liable under any circumstances for incidental or consequential, punitive, compensatory damages or loss profits or for claims relating to this Lease.

(e)  This Article 21 shall survive the termination of this Lease.

22.  **DAMAGE BY FIRE OR OTHER CASUALTY.**

(a)  Tenant shall immediately notify Landlord of any damage or destruction to the Premises and, if Landlord shall not terminate this Lease as hereinafter provided, Landlord shall repair and restore the Premises to substantially its condition as of the Commencement Date if such repair is covered by insurance proceeds. If insurance proceeds are insufficient to complete repair, Landlord may terminate this Lease by notice given within thirty (30) days of Landlord receiving written notice that insurance proceeds will not be sufficient unless Tenant agrees to pay the difference in cost. If during the last two (2) years of the Term the Premises shall be substantially damaged or destroyed by fire or other casualty, either party may terminate this Lease by giving notice of its election to terminate, such notice to be given within ninety (90) days after the occurrence of such damage or destruction, provided, however, that Tenant shall have the right to negate Landlord's notice of termination by giving notice to Landlord within thirty (30) days after Landlord's notice of termination, of its election to exercise the next applicable unexercised Option Term. Tenant shall be entitled to an abatement of rent for the period in which the Premises are unusable. Unless this Lease is terminated by Landlord, Tenant shall repair and re-fixture the interior of the Premises in a manner and to a condition at least equal to that existing prior to the damage or destruction, and reopen for business, within ninety (90) days after Landlord has substantially completed its repairs to the Premises.

(b)  Landlord's obligation to rebuild and repair under this Article 22 shall in any event be limited to restoring Landlord's Work to substantially the same condition in which the same existed on the date the Premises was originally delivered to Tenant, in conformance with all then applicable laws and building codes. In no event shall Landlord be required to repair or replace Tenant's improvements and betterments, merchandise, trade fixtures, furnishings or equipment.

(c)  Tenant agrees that during any period of reconstruction or repair of the Premises it shall continue the operation of its business within the Premises to the extent practicable, as determined by Tenant in its commercially reasonable discretion. During the period from the occurrence of the casualty until Landlord's repairs are completed, the Base Rent and Additional Rent shall be reduced or abated to such extent as may be fair and reasonable under the circumstances; however, there shall be no abatement of rent in the event the underlying damage was caused by Tenant, or its contractors, subcontractors, employees, agents or invitees.

23.  **ASSIGNMENT AND SUBLETTING.**

It is understood and agreed that this Agreement is entered into by the Parties for their respective mutual benefit. It is agreed that Tenant shall not assign or sublet this Agreement or allow this Agreement to be transferred by operation of law without the express written consent of Landlord. Landlord shall not unreasonably withhold its consent. Any proposed assignee must have equal or greater financial strength as the original tenant. Notwithstanding anything in this Lease to the contrary, Tenant may assign this Lease or sublet the Premises or any portion thereof, at any time, without Landlord's consent, to (a) any Affiliate (as defined below) or any entity which owns or is owned by an Affiliate, (b) any entity acquiring substantially all of the assets of Tenant or (c) another corporation in connection with the merger of Tenant with such corporation (each of the foregoing, a "**Permitted Transferee**") so long as the Permitted Transferee has equal or greater financial strength . As used herein, "**Affiliate**" shall mean any entity which acquires all or a part of Tenant, or which is acquired in whole or in part by Tenant, or which is controlled directly or indirectly by Tenant, or which

14

entity controls Tenant, directly or indirectly. For purposes of this definition, "control" shall mean the ownership of a majority of the outstanding voting stock of a corporation or other majority equity or control interest if the entity is not a corporation and the possession of power to direct the management and policy of such corporation or such other entity. Tenant shall be required to provide written notice and all reasonable documentation to confirm such affiliation, acquisition or merger and an assumption of lease in a form reasonably acceptable to Landlord.

24. **CONDEMNATION.** In the event that the whole of the Premises shall be lawfully condemned or taken in a manner for any public or quasi-public use, or conveyed in lieu thereof, this Lease shall terminate as of the date of vesting of title. In the event that only a portion of the Premises shall be so condemned or taken then, effective as of the date of vesting of title, the Base Rent hereunder shall be abated in an amount directly proportionate to the reduction in the size of the Premises as may be reasonably attributable to such condemnation. Except in the event of a total condemnation, Landlord, upon receipt of the award in condemnation, shall make necessary repairs and alterations ("Condemnation Repairs") so as to constitute the Premises an architectural unit. Notwithstanding the foregoing, Landlord shall not be obligated to expend monies in excess of those received. If the proceeds received are insufficient to complete the Condemnation Repairs, Landlord may elect to terminate this Lease unless Tenant shall agree to reimburse Landlord for the additional expense. If Landlord elects not to terminate this Lease, as aforesaid, this Lease shall be and remain unaffected by such condemnation or taking, except that the Base Rent shall be abated to the extent, if any, hereinbefore provided. In the event of any condemnation or taking of all or a portion of the Premises, Landlord shall be entitled to receive the entire award in condemnation proceedings, including, without limitation, any award for the value of the unexpired term of this Lease and the interest vested by this Lease in Tenant, and Tenant irrevocably assigns to Landlord any and all right, title and interest of Tenant now or hereafter arising in or to any such award or any part thereof. Tenant shall be entitled to claim damages equal to the unamortized cost of leasehold improvements made by Tenant at Tenant's cost during the Term and any actual business loss or relocation award available provided such claim does not decrease Landlord's award. Any restoration to the Premises relating to Tenant's Work or alterations made necessary by such condemnation shall be performed by Tenant at Tenant's sole expense immediately following Landlord's substantial completion of the Condemnation Repairs.

25. **DEFAULT; REMEDIES.**

(a) Tenant shall be in default under this Lease upon the occurrence of any one or more of the following events or occurrences:

(i) Landlord does not actually receive any payment of the full amount of the Base Rent, Additional Rent or other rent or other payment or reimbursement due within ten (10) days of the date first due or within three (3) days after written notice by Landlord;

(ii) Tenant fails to fully and timely observe or perform any of the terms or covenants of this Lease other than those referred to in Articles 25(a)(i), (iii), (iv) or (v) within thirty (30) days after Landlord gives notice to Tenant specifying the nature of such failure, or such additional time as may be reasonably required to correct;

(iii) Tenant fails to take possession or occupancy of, the Premises);

(iv) The filing or execution or occurrence of: (aa) a petition by or against Tenant or any guarantor hereof in bankruptcy or seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any provision of law, (bb) adjudication of Tenant or any guarantor hereof as a bankrupt or insolvent, or insolvency in the bankruptcy or equity sense, (cc) an assignment by Tenant or any guarantor hereof for the benefit of creditors, (dd) a petition or other proceeding by or with respect to any

15

portion of Tenant's or guarantor's property, (ee) any levy, execution or attachment against Tenant or any guarantor hereof or their property, (ff) (gg) the revocation or suspension of Tenant's permit(s) or license(s), if any, issued by any authority permitting Tenant to conduct its business at the Premises, (hh) the issuance of any citation or violation notice against Tenant by any governmental authority, (ii) the maintenance of unsafe, unsanitary or unhealthy conditions at the Premises, or (jj); or

        (v)        an assignment or sublease in breach of Article 23.

      (b)      Upon the occurrence of one or more of the aforesaid events of default set forth in Article 25(a), or upon the occurrence of any other default or defaults by Tenant under this Lease, and the elapse of the grace period, if any, set forth herein, Landlord may, at Landlord's option, without any demand or notice unless required in this Article 25:

        (i)        Terminate this Lease by giving Tenant notice of termination, in which event this Lease shall expire and terminate on the date specified in such notice of termination, which date shall be five (5) days after such notice of termination, with the same force and effect as though the date so specified were the date herein originally fixed as the termination date of the Term, and all rights of Tenant under this Lease and in and to the Premises shall expire and terminate, and Tenant shall remain liable for all obligations under this Lease arising up to the date of such termination, and Tenant shall surrender the Premises to Landlord on the date specified in such notice; or

        (ii)        Terminate this Lease as provided in Article 25(b)(i) hereof and recover from Tenant all damages Landlord may incur by reason of Tenant's default, including, without limitation, a sum which, at the date of such termination, represents the then value of the excess, if any, of (aa) the Base Rent, Additional Rent and all other sums which would have been payable hereunder by Tenant for the period commencing with the day following the date of such termination and ending with the date hereinbefore set for the expiration of the then Term hereby granted, over (bb) the aggregate reasonable rental value of the Premises for the same period, all of which excess sum shall be deemed immediately due and payable; or

        (iii)        Without terminating this Lease, recover possession of the Premises and receive all Base Rent, Additional Rent and other rents and amounts due and coming due under this Lease for the entire remaining Term, together with all other amounts previously due.  Upon making such payments, Tenant shall be entitled to receive from Landlord all rents received by Landlord from other assignees, tenants, and subtenants on account of the Premises during the Term provided that the monies to which Tenant shall so become entitled shall in no event exceed the entire amount actually paid by Tenant to Landlord pursuant to the preceding sentence less all costs, expenses and attorneys' fees of Landlord incurred in connection with the reletting of the Premises; and/or

        (iv)        Pursue such other remedies as are available at law or equity, including self-help remedies if permitted by law.

      (c)      Landlord may (but shall have no obligation to) perform any covenant or agreement required to be performed by Tenant under this Lease but which Tenant has failed to perform, provided Landlord has first given notice to Tenant of its intention to do so.  Any costs incurred by Landlord in performing such covenant or agreement shall be reimbursed immediately upon notice thereof.

      (d)      Landlord's pursuit of any remedy or remedies, including, without limitation, any one or more of the remedies stated in this Article 25 shall not (i) constitute an election of remedies or preclude pursuit of any other remedy or remedies provided in this Lease or any other remedy or remedies provided by law or in equity, separately or concurrently or in any combination, or (ii) serve as the basis for any claim of constructive eviction, or allow Tenant to withhold any payments under this Lease.

16

(e)     Tenant shall pay all costs, expenses and attorneys' fees that may be incurred or paid by Landlord in enforcing the terms of this Lease.

(f)     Neither Tenant's interest in this Lease, any guarantor of this Lease, any estate hereby created in Tenant nor any interest herein or therein, shall pass to any trustee or receiver or assignee for the benefit of creditors or otherwise by operation of law, except as may specifically be provided pursuant to the Bankruptcy Code (11 USC §101 et. seq.), as the same may be amended from time to time.

(g) It is understood and agreed that this Lease is a lease of real property in a Premises as such lease is described in Section 365 of the Bankruptcy Code, as the same may be amended from time to time. Upon the filing of a petition by or against Tenant or any guarantor of this Lease under the Bankruptcy Code, Tenant or any guarantor of this Lease, as debtor and as debtor-in-possession, and any trustee who may be appointed with respect to the assets of or estate in bankruptcy of Tenant or any guarantor of this Lease, agree to pay monthly in advance on the first day of each month, as reasonable compensation for the use and occupancy of the Premises, an amount equal to all Base Rent, Additional Rent and other charges otherwise due pursuant to this Lease. Included within and in addition to any other conditions or obligations imposed upon Tenant or its successor in the event of the assumption and/or assignment of this Lease are the following: (1) the cure of any monetary defaults and reimbursement of pecuniary loss within not more than thirty (30) days of assumption and/or assignment; (2) the deposit of a sum equal to not less than three (3) months' Base Rent and Additional Rent, which sum shall be determined by Landlord, in its sole discretion, to be a necessary deposit to secure the future performance under this Lease of Tenant or its assignee; (3) the use of the Premises as set forth in the Fundamental Lease Provisions, and the quality, quantity and/or lines of merchandise, goods or services required to be offered for sale being unchanged; and (4) the prior written consent of any mortgagee to which this Lease has been assigned as collateral security.

26.     **MORGAGES.**

(a)     Upon request by any holder of a mortgage ("Mortgagee") which now or hereafter has a mortgage encumbering the Premises ("Mortgage"), Tenant covenants and agrees to subordinate Tenant's rights under this Lease to such Mortgagee, and to any and all advances to be made under its Mortgage and the interest thereon, and to all renewals, modifications, replacements, and extensions thereof, in consideration of a commercially reasonable nondisturbance agreement. Tenant also agrees that any Mortgagee may elect to have this Lease made prior to the Mortgage, and in the event of such election and upon notification by any such Mortgagee to Tenant to that effect, this Lease shall be deemed prior in lien to any such Mortgage, whether this Lease is dated or filed prior to or subsequent to the date of the Mortgage. Tenant agrees to such modifications of this Lease as Mortgagee may request so long as such changes do not increase or adversely change Tenant's obligations or decrease Landlord's obligations.

(b)     Tenant shall, in the event of the exercise of the power of sale or deed in lieu of foreclosure under any Mortgage covering the Premises, attorn to and recognize such purchaser as landlord under this Lease; provided that said purchaser shall not be liable for any act or omission of any prior landlord or be subject to any offsets or defenses which Tenant may have against any prior landlord. Tenant further covenants and agrees that, should any party so succeeding to the interest of Landlord require a separate agreement of attornment regarding the matters covered by this Lease, and provided the Mortgagee agrees to deliver to Tenant an agreement not to disturb Tenant's quiet enjoyment of the Premises as long as Tenant is not in default under this Lease, then Tenant shall promptly, upon request, enter into any such attornment agreement. Failure of Tenant to execute any statements, certificates or instruments necessary or desirable to effectuate the provisions of this Article 26(b) within twenty (20) days after written request to do so by Landlord, shall constitute a material breach of this Lease.

17

(c) At any time and from time to time, Tenant agrees, upon request from Landlord, to execute, acknowledge and deliver to Landlord or any potential purchaser of the Premises, or to any mortgagee or potential mortgagee, within twenty (20) days after request, a commercially reasonable estoppel certificate or statement in writing certifying to all or any part of the following information as Landlord shall request, to the extent such facts are true and ascertainable: (i) that this Lease constitutes the entire agreement between Landlord and Tenant and is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modification), (ii) the amounts of Base Rent, Additional Rent and other charges under this Lease and the dates to which same have been paid, and that there are no prepaid rents or other sums hereunder, and the amount of security, if any, deposited with Landlord, (iii) that the Premises have been satisfactorily completed, and that all conditions precedent to this Lease taking effect have been carried out, (iv) that Tenant has accepted possession of the Premises, that the Term has commenced, that Tenant is occupying the Premises and operating Tenant's business full-time therefrom, and there are no defaults or offsets which Tenant has against enforcement of this Lease by Landlord, and (v) the actual Commencement Date and expiration date of this Lease. Tenant's certificate or statement shall also contain such other information as may be reasonably or customarily required by the present or potential landlord or mortgagee. Failure of Tenant to execute any statements, certificates or instruments necessary or desirable to effectuate the provisions of this Article 26 within twenty (20) days after written request to do so by Landlord shall constitute a material breach of this Lease.

27. **SUCCESSORS AND ASSIGNS.** The provisions of this Lease shall extend to and bind Landlord and Tenant and their respective successors, heirs, legal representatives, and permitted assigns; provided, however, that no assignment or subletting by, through or under Tenant in violation of Article 23 hereof shall vest in such assignee or subtenant any right, title or interest whatsoever. Upon any sale or transfer of the Premises, the Landlord named herein shall be, and hereby is, entirely free and relieved of all covenants and obligations of Landlord hereunder arising or occurring on or after such sale or conveyance.

28. **ACCESS TO PREMISES.** Upon notice to Tenant (except no notice shall be necessary in the event of an emergency) Landlord shall have free access to the Premises at reasonable times for purposes of inspecting, examining, showing or displaying same, or placing "For Rent" notices no larger than 10 square feet upon the Premises during the last six (6) months of the Term or for making any repairs thereto or to Landlord's adjoining property.

29. **TERMINATION.** No termination of this Lease prior to the normal expiration thereof, shall affect Landlord's right to collect rent for the period prior to termination thereof. No surrender of the Premises or any party thereof by delivery of keys or otherwise shall operate to terminate this Lease unless and until accepted in writing by an authorized officer or authorized representative of Landlord.

30. **ESTATE IN LAND.** This Lease shall create the leasehold relationship of Landlord and Tenant between the parties hereto, and no estate shall pass out of Landlord.

31. **HOLDING OVER.**

(a) If this Lease is not renewed or extended or a new Lease is not entered into between the parties and Tenant shall then remain in possession of the Premises after the expiration date (or sooner termination of this Lease), then absent Landlord's consent in writing, such occupancy shall be regarded as a tenancy by sufferance; and Landlord may accept monies received from Tenant as use and occupancy charges without prejudice to Landlord's right to pursue eviction proceeding against Tenant. Irrespective of whether or not Landlord accepts rent from Tenant for a period beyond the expiration or termination date, the parties agree that Tenant's occupancy of the Premises after the expiration or termination date shall be upon all of the terms set forth in this Lease except Tenant shall pay on the first day of each month of the holdover period an amount equal to one and one half (1.25) times for the first month and 1.5 times thereafter of the monthly sum of the Base Rent, Additional Rent, Taxes, CAM Charges, Insurance Charge, and additional rent payable by Tenant during the last

18

month of the Term (i.e., the month immediately prior to the holdover period), except that Landlord shall not be required to perform any work, furnish any materials or make any repairs within the Premises during the holdover period and except that such tenancy shall be on a month-to-month basis. If Landlord shall, at any time after the expiration of the Term or after the expiration of the term created thereafter, proceed to remove Tenant from the Premises as a holdover, the Rent for the use and occupancy of the Premises during any holdover period shall be calculated in the same manner as set forth above.

(b)     No extension or renewal of this Lease shall be deemed to have occurred by any holding over. If Tenant shall hold-over or remain in possession of any portion of the Premises beyond the termination date, Tenant shall be subject not only to summary proceeding and all damages related thereto, but also to any and all damages arising out of any lost opportunities (and/or new Leases) by Landlord to relet the Premises (or any part thereof). All damages to Landlord by reason of such holding over by Tenant may be subject of a separate action and they need not be asserted by Landlord in any summary proceedings against Tenant.

## 32.     INTEREST; ATTORNEYS' FEES.

(a)     All Base Rent, Additional Rent and any other costs, expenses, sums or amounts payable or reimbursable hereunder by Tenant to Landlord shall be deemed to be rental hereunder whether or not designated as such, which, if not promptly paid on or before the date due, time being of the essence, shall bear interest at the rate of ten percent (10%) (but in no event higher than the highest rate enforceable by law) from the due date until paid. Such interest shall be due if payment is not made on the due date, regardless of whether Article 25 provides for any additional grace period or notice.

(b)     If any amounts owing under this Lease are collected from Tenant or any guarantor of Tenant's obligations hereunder by or with any assistance from or consultation with any attorney at law or a collection agent, Tenant covenants and agrees to reimburse Landlord for its legal fees and collection agency fees, and such fees shall constitute additional rent hereunder.

## 33.     RECORDING. Neither the Lease nor a memorandum of the Lease may be recorded without the consent of the Landlord.

## 34.     NON-WAIVER.

(a)     No failure by Landlord to timely bill Tenant for any payments hereunder, or to insist upon the strict performance, in any of one or more instances, upon any breach of any term, covenant, or condition herein contained shall be deemed to be a waiver of such term, covenant or condition, nor of any subsequent breach of the same or any other term, covenant or condition herein contained. Any subsequent acceptance by Landlord of any Base Rent, Additional Rent or any other sums due hereunder shall not be deemed to be a waiver of any breach or default by Tenant of any term, covenant, or condition of this Lease regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such sum. No covenant, term, or condition of this Lease shall be deemed to have been waived by Landlord unless such waiver shall be in writing by an authorized officer of Landlord.

(b)     No payment by Tenant or receipt by Landlord of an amount less than the entire Base Rent or other rent or other sum required herein shall be deemed a waiver of Landlord's right to receive the entire amount herein stipulated. No partial payment or endorsement on any check or any letter accompanying such payment or rent shall be deemed an accord and satisfaction, and Landlord may accept such payment without prejudice to Landlord's right to collect the balance of any rents due under this Lease. After service of any notice of termination, or other notice, or commencement of any suit or dispossessory or distress proceeding, Landlord may receive and collect any rent due and such collection or receipt shall not operate as a (a) reinstatement, continuance, renewal, or extension of the Term of (b) waiver affecting such notice, suit or proceeding.

19

35.     **TIME OF THE ESSENCE.**  Time is of the essence with respect to Tenant's obligations and covenants under this Lease.

36.     **SEVERABILITY.**  If any clause, provision, subparagraph or paragraph of this Lease is or becomes unconstitutional, illegal, invalid, or unenforceable because of present or future Laws, the remaining parts of this Lease shall not be affected thereby unless such invalidity is, in the sole determination of Landlord, an essential element of this Lease in which event Landlord has the right to terminate this Lease on written notice to Tenant.

37.     **NOTICES.**  All notices, consents, approvals or demands with respect to this Lease shall be in writing, and if to Tenant the original shall be sent by certified mail, return receipt requested, or by a nationally recognized overnight courier service which provides delivery receipts, to the Tenant specified in the Fundamental Lease Provisions or to such other persons at such other addresses as Tenant shall notify Landlord in accordance with this Article 37.  All notices or demands to Landlord shall be sent certified mail, return receipt requested, or national overnight commercial courier to the address of Landlord specified in the Fundamental Lease Provisions or to such other persons and at such other places as Landlord may designate to Tenant in writing in accordance with this Article 37.  Notice shall be deemed received (i) if mailed, three (3) business days after the date of posting by U.S. Mail; or (ii) if sent by overnight courier, on the following business days after depositing such notice with the courier service.  Upon request by Landlord or any Mortgagee of the Premises, a copy of all notices or demands to Landlord shall also be sent to such Mortgagee(s).

38.     **FORCE MAJEURE.**  The parties hereto shall be excused for the period of any delay in the performance of any obligations hereunder, except the payment of Base Rent or Additional Rent, when prevented from so doing by cause or causes beyond such party's control which shall include, without limitation, industry-wide labor disputes, civil commotion, war, war-like operations, invasion, rebellion, hostilities, military or usurped power, sabotage, acts of terrorism, governmental regulations or controls, fire or other casualty, inability to obtain any material, services or through acts of God.   While this Article in no event shall abate Tenant's obligation to pay Base Rent or Additional Rent, in the event that any of the above occurrences prevent the prompt payment of Base Rent or Additional Rent, upon proof of the same, Landlord shall abate any late fees incurred by Tenant due to the Force Majeure event.  The Parties agree that this abatement of late fees is the only financial abatement available to Tenant under this Article 38.

39.     **BROKERAGE.**  Tenant acknowledges that NAI Harmon Group solely represents the interest of Landlord.  Landlord shall pay its broker a real estate commission as provided in a separate commission agreement between Landlord and NAI Harmon Group and Tenant shall have responsibility in connection therewith.

40.     **ENTIRE AGREEMENT; AMENDMENT; CONSENTS.**  This Lease and all exhibits or riders attached hereto (if any) set forth the entire agreement between the parties hereto concerning the Premises and no representations, inducements, promises and agreements, oral or otherwise, between the parties not embodied herein, shall be of any force and effect.  No amendment, modification, termination, change or addition to this lease shall be binding upon either party unless reduced to writing and signed by Tenant and Landlord.  Any consent required or requested of Landlord under this Lease or any portion thereof, may be granted or withheld by Landlord, without inquiry into the reasonableness or unreasonableness of the granting or withholding of same unless this Lease provides that such consent or approval for such matter must be reasonable.

41.     **JURISDICTION AND VENUE.**  The parties agree that with respect to any dispute arising under or in connection with this Lease that the exclusive jurisdiction and venue shall reside with the courts of the county and State in which the Premises shall be located and/or the United States District Courts, and such appellate courts as have supervision thereof, and the parties agreed to submit to such exclusive jurisdiction and venue, and service of process by certified mail to the addresses for notice set forth in Article 37 hereof.

20

42. **RULES AND REGULATIONS.** The rules and regulations annexed hereto, if any, and all reasonable and non-discriminatory rules and regulations which Landlord may hereafter from time to time adopt, and promulgate for the government and management of the Premises, are hereby made a part of this Lease and shall, during and within the term, be fully observed and performed by Tenant as if the same were contained herein as covenants. A breach of said rules and regulations by Tenant shall be deemed a material breach of this Lease.

43. **WAIVER OF COUNTERCLAIMS.** TENANT SHALL NOT IMPOSE ANY NON-COMPULSORY COUNTERCLAIM OR COUNTERCLAIMS IN A SUMMARY PROCEEDING OR OTHER ACTION BASED ON TERMINATION OR HOLDOVER, IT BEING THE INTENT OF THE PARTIES HERETO THAT TENANT BE STRICTLY LIMITED IN SUCH INSTANCE TO BRINGING A SEPARATE ACTION IN THE COURT OF APPROPRIATE JURISDICTION. THE FOREGOING WAIVER IS A MATERIAL INDUCEMENT TO LANDLORD MAKING, EXECUTING AND DELIVERING THIS LEASE, AND TENANT'S WAIVER OF ITS RIGHT TO COUNTERCLAIM IN ANY SUMMARY PROCEEDING OR OTHER ACTION BASED ON TERMINATION OR HOLDOVER IS DONE KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY.

44. **QUIET ENJOYMENT.** Upon payment by Tenant of the rents herein provided, and upon the observance of all covenants, terms and conditions on Tenant's part to be observed and performed, Tenant shall peaceably and quietly hold and enjoy the Premises for the Term without hindrance or interruption by Landlord or any other person or persons lawfully claiming by, through or under Landlord, subject, nevertheless, to the terms and conditions of this Lease, and any mortgage and/or deed of trust to which this Lease is subordinate.

45. **FURNISHING OF FINANCIAL STATEMENTS.** Upon Landlord's written request from time to time, but not more often than once every twelve months, Tenant shall within ten (10) days after Landlord's request therefor, furnish Landlord with financial statements (including, without limitation, operating statements including an annual profit and loss statement for the individual store unit covered by this Lease) reflecting Tenant's current financial condition, and written evidence of ownership of managing and controlling interests in Tenant and in any entities which directly or indirectly control or manage Tenant. Landlord shall maintain all financial information provided in a confidential manner.

46. **Intentionally Deleted.**

47. **WAIVER OF JURY TRIAL.** LANDLORD AND TENANT HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON, OR IN RESPECT OF, ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT HEREUNDER, TENANT'S USE OR OCCUPANCY OF THE PREMISES AND/OR ANY CLAIM OF INJURY OR DAMAGE.

48. **SPECIFIC PERFORMANCE OF LANDLORD'S RIGHTS.** Landlord shall have the right to obtain specific performance of any and all of the covenants or obligations of Tenant under this Lease, and nothing contained in this Lease shall be construed as or shall have the effect of limiting such right.

49. **TENANT DAMAGES.** If Tenant shall request Landlord's consent and Landlord shall fail or refuse to give such consent, Tenant shall not be entitled to any damages for any withholding by Landlord of its consent, it being intended that Tenant's sole remedy shall be an action for specific performance or injunction, and that such remedy shall be available only in those cases where Landlord has agreed not to unreasonably withhold its consent or where, as a matter of law, Landlord may not unreasonably withhold its consent.

21

50.   **Intentionally Deleted.**

51.   **MISCELLANEOUS.**

(a)      Intentionally Deleted.

(b)      Confidentiality. It is agreed and understood that Tenant may acknowledge only the existence of this Lease by and between Landlord and Tenant, and that Tenant may not disclose any of the terms and provisions contained in this Lease to any other tenant or occupant in the Premises or to any agent, employee, subtenant or assignee of such tenant or occupant. Tenant acknowledges that any breach by Tenant of the agreements set forth in this Article 51(b) shall cause Landlord irreparable harm. The terms and provisions of this Article 51(b) shall survive the termination of this Lease (whether by lapse of time or otherwise).

(c)      Attorney's Fees. In any action or proceeding hereunder, the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs (including non-taxable costs) and expenses. The prevailing party shall be entitled to recover all of its reasonable attorneys' fees in any dispute arising under this Lease, without regard to the applicability of any applicable fee-limiting statute. If either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding incurred by the other party, including reasonable attorneys' fees, costs (including non-taxable costs) and expenses.

(d)      Waiver of Redemption by Tenant. TENANT HEREBY WAIVES FOR TENANT AND FOR ALL THOSE CLAIMING UNDER TENANT ALL RIGHT NOW OR HEREAFTER EXISTING TO REDEEM BY ORDER OR JUDGMENT OF ANY COURT OR BY ANY LEGAL PROCESS OR WRIT, TENANT'S RIGHT OF OCCUPANCY OF THE PREMISES AFTER ANY TERMINATION OF THIS LEASE.

(e)      Non-Discrimination. Tenant herein covenants by and for itself, its successors and assigns, and all persons claiming under or through them, and this Lease is made and accepted upon and subject to the following conditions: That there shall be no discrimination against or segregation of any person or group of persons, on account of race, color, religion, creed, national origin, ancestry, handicap, age, marital status, or sex in the leasing, subleasing, renting, transferring, use, occupancy, tenure or enjoyment of the Premises, nor shall Tenant for itself, or for any person claiming under or through it, establish or permit such practice or practices of discrimination or segregation with reference to the selection, location, number or occupancy of tenants, leases, subleases, subtenants, or vendors in the Premises.

(f)      Excavation. If an excavation shall be made upon land adjacent to the Premises, or shall be authorized to be made, Tenant shall afford to the person causing or authorized to cause such excavation license to enter upon the Premises for the purpose of doing such work as said person shall deem necessary to preserve the wall or the building of which the Premises form a part from injury or damage and to support the same by proper foundation.

(g)      Facsimile/PDF. Following the initial execution of this Lease, facsimile or PDF copies of any amendment to this Lease or any consent, approval or other indication of acceptance pursuant to this Lease executed by Landlord or Tenant may be relied upon as an original signature.

(h)      Captions. The captions of Articles hereunder are inserted only as a matter of convenience and, for reference, and in no way define, limit, or describe the scope or intent of this lease nor in any manner affect this lease.

52.   **INITIAL RENT ABATEMENT:** Payment of Base Rent and Additional Rent will commence sixty days after the Commencement Date. No Base Rent or Additional Rent shall be due prior to March 1, 2022.

**53.    TENANT REIMBURSEMENT OF LANDLORD'S WORK:**  Landlord shall complete on behalf of Tenant the work listed on Exhibit C, ("Landlord's Work"), with a total cost not to exceed $2,412,850.00 ("TI Cost").  Any costs over and above $2,412,850.00 shall be at the immediate cost of Tenant.  Tenant shall reimburse Landlord for Landlord's Work through payment of an additional $2.03 per sq/ft as Additional Rent ("TI Reimbursement") beginning on the Rent Commencement Date and continuing through the remainder of the Initial Term plus the Grant Funds as described below.  If Tenant shall be in breach of this Lease, resulting in a termination of the Lease, the entire remaining, but unpaid, portion of this TI Cost shall immediately become due and owing.

If Tenant, elects to exercise its option in Section 54 below, then the TI Reimbursement shall remain at $2.03 per sq/ft for the remainder of the Initial Term, except that at the conclusion of the twenty-fourth month of this Lease, the $2.03 per sq/ft shall be calculated based on a total of 120,000 square feet.

In the event that Tenant declines to exercise its option in Section 54 below, at the conclusion of the twenty-fourth month of this Lease, the reimbursement shall be increased to $3.04 per sq/ft and shall continue to be calculated on a total of 80,000 square feet.  In addition to this escalation, Tenant will also promptly pay an additional reimbursement payment of $160,000.00 to Landlord by the end of the twenty-fifth month of this Lease.

Tenant is expecting to receive a grant from JobsOhio in the amount of $500,000.00 ("Grant Funds").  Tenant shall deliver the Grant Funds to Landlord upon receipt.  If Tenant does not receive the Grant Funds as anticipated, Tenant shall pay Landlord $500,000.00 from its own funds by the end of the eighteenth month of this Lease.

**54.    OPTION FOR ADDITIONAL 40,000 SQUARE FEET OF BUILDING:**  Tenant shall have the option to request that Landlord build an additional 40,000 square foot addition to the Building ("Additional Space").  Tenant may exercise this request at any time within the first year of this Lease by providing written notice to Landlord.  Landlord will construct the additional space upon signature of a Lease amendment which the Landlord and Tenant shall negotiate in good faith at the time of the exercise of the option.  The Additional Space shall consist of three new walls, a roof extension, a concrete floor, sprinklers and lighting consistent with the initial Building.  Landlord will not provide additional improvements or any tenant improvements with respect to the addition.  Tenant shall be responsible for all costs and improvements beyond the new walls, roof extension, concrete floor, sprinklers and lighting.

While the base rent shall be resolved in the lease amendment, Landlord shall provide this Additional Space to Tenant at $5.75 per square foot if Landlord's costs of construction do not exceed $61.00 per square foot.  Any cost of construction in excess of $61.00 per square foot shall require a corresponding proportional increase in the Base Rent for the Additional Space equal to construction costs in excess of $61.00 per square foot.  As an example, if Landlord's cost of construction per square foot is ten percent (10%) higher for the Additional Space, then the base rent shall also increase by ten percent (10%).  Landlord shall cap this increase at twelve percent (12%) meaning that the base rent for the Additional Space shall not exceed $6.44 per square foot.

**55.    OPTION TO LEASE ADDITIONAL SPACE.**  Provided Tenant is not in default under the Lease, in addition to Tenant's right under Section 54, Tenant shall have a Right of First Refusal and an ongoing option to lease additional space in the area controlled by Landlord to the west of the Premises.  When Landlord receives an offer to construct additional space to the west of the Premises, or if Landlord decides to construct additional space to the west of the Premises, Landlord will provide Tenant written notice of the availability of additional space up to 100,000 additional square feet.  Upon receipt of that notice, Tenant will have thirty (30) days to notify Landlord in writing of its intention to lease the additional space available.  If Tenant exercises its option to lease additional space, Landlord and Tenant shall enter into a separate lease for the additional space.  If Tenant fails to timely provide notice to Landlord in writing of its intention to exercise its option to lease additional space after being provided timely notice from Landlord, then the option shall lapse, and Landlord may market the additional space.

23

56.    **RIGHT OF FIRST REFUSAL TO PURCHASE BUILDING.**    Tenant shall also have a Right of First Refusal to purchase the Premises (including the Additional Space and any other space leased by Tenant pursuant to this Lease, as it may amended).    If Landlord receives an offer to purchase the building in which the Premises is located ("Building") that Landlord determines in its sole discretion is acceptable to Landlord, Landlord will provide Tenant written notice of its right to exercise its First Right of Refusal to Purchase the Building.    Upon receipt of that notice, Tenant will have fifteen (15) days to notify Landlord in writing of its intention to exercise its First Right of Refusal to Purchase the Building.  If Tenant fails to timely provide notice to Landlord in writing of its intention to exercise its First Right of Refusal to Purchase the Building, then the option shall lapse and Landlord may sell the Building pursuant to the offer to purchase that Landlord previously received.  If Tenant exercising its Right of First Refusal, Tenant must abide by the terms and conditions of the offer previously accepted by Landlord, except that all deadlines may be extended by fifteen (15) days.

SIGNATURE PAGES TO FOLLOW

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Lease and exhibits thereto in duplicate, individually or through their authorized officers, agents, or attorneys-in-fact, as the case may be, causing their respective seals to be affixed hereto the day and year first above written.

LANDLORD:

COMMERCE DRIVE HOLDING ONE, LLC

By: C. Edward Harmon, Member

### ACKNOWLEDGMENT OF LANDLORD

STATE OF _Ohio_ )
                            ) SS
COUNTY OF _Lucas_ )

On _Sept. 7th_, 2021, before me, personally appeared C. Edward Harmon, who is personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

LEAH RUNKLE
Notary Public, State of Ohio
My Commission Expires:
8/30/2025

Notary Public

My Commission Expires: _8/30/2025_

25

**TENANT:**

**APG, Inc.**

Name:  Helga Arminak
Title:    CEO

## ACKNOWLEDGMENT OF TENANT

**STATE OF**                            )
                                                  ) SS
**COUNTY OF**                       )

On  August 30,  2021,  before  me,  personally  appeared _____,  who  is
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or
the    entity    upon    behalf    of    which    the    person(s)    acted,    executed    the    instrument.

WITNESS my hand and official seal.

_____
Notary Public

My Commission Expires:_____

26

# California All-Purpose Certificate of Acknowledgment

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _Los Angeles_                                s.s.

On _09-02-2021_ before me, _Kelly Moore, Notary Public_
                                                        (here insert name and title of the officer)

personally appeared _Helga Armrdak_
                                                        (name(s) of signer(s))

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature of Notary Public

KELLY MOORE
COMM. #2274101
Notary Public - California
Los Angeles County
My Comm. Expires Jan. 26, 2023

Seal

──────────── OPTIONAL INFORMATION ────────────

Although the information in this section is not required by law, it could prevent fraud and removal and reattachment of this acknowledgment form to an unauthorized document and could prove useful to persons relying on the attached document.

## Description of Attached Document

The preceding Certificate of Acknowledgment is attached to a document titled/for the purpose of _Lease Agrmt_
_____
_____

containing _____ pages, and dated _____.

The signer(s) capacity or authority is/are as:
☐ Individual(s)
☐ Attorney-in-fact
☐ Corporate Officer(s) _____
                                       title(s)
_____

☐ Guardian/Conservator
☐ Partner - Limited/General
☐ Trustee(s)
☐ Other: _____

representing: _____
                     name(s) of person(s) or entity(ies) signer is representing

### Additional Information

Method of Signer Identification

Proved to me on the basis of satisfactory evidence:
☐ form(s) of identification ☐ credible witness(es)

Notarial event is detailed in notary journal on:

Page # _____ Entry # _____

Notary contact: _____

Other
☐ Additional Signer ☐ Signer(s) Thumbprints(s)
☐ _____

© 2009-2015 Notary Learning Center - All Rights Reserved  You can purchase copies of this form from our web site at www.TheNotarysStore.com

**EXHIBIT A**

**SITE PLAN OF PREMISES**



**EXHIBIT B**

SITE PLAN OF BUILDING



**EXHIBIT C**

**LANDLORD'S WORK**

**See Attached Summary of Landlord Work**



August 13, 2021

Mr. Craig Stambaugh
APG
25925 Commerce Drive
Defiance, OH 43512

RE: TI

Dear Craig,

Logan Creek Construction Co. is pleased to submit this proposal for Tenant Improvements. This includes all labor and materials as follows:

**GENERAL CONDITIONS:**

**Tenant Improvements**

- Natural Gas generator as power backup 25KVA.                                         $78,000.00
- Add on to 27 Piers to accommodate 2 – 10-ton crane rail systems.          $45,700.00
- Change floor slab to 7" thick with 6x6 d7.5/d7.5 in lieu of 6" w/ 6x6 8/8 w.w.m.. $148,150.00
- Office needs of 7,500 sf including 2 conference rooms, IT server room, breakroom, locker room, 3-4 private offices.
  *Trucker Trap and Shipping office with restroom.
  *1,500 sf quality lab adjoining the shipping office totaling 10,000 sf.
  *Mechanical Room.
  *Paint and Carpet.
  *Cabinets.
  *Plumbing.
  *Office electric & Parking lighting.                                                       $1,080,000.00
- 125 Vehicular parking spaces.                                                              $220,000.00
- Demising wall full height to roof deck. Metal both sides and insulated.      $231,000.00
- Air-conditioned manufacturing is based on load given.                            $330,000.00
- Provide a primary metered service and transformer to feed the 4,000a service.
  3,000 kva power feeds for the building 4000a service.                           $280,000.00

**Grand Total: $2,412,850.00**

If this proposal meets your approval please indicate by signing below and returning to us via email to Jsmith@logancreekco.com  Please call me with any questions at (419) 697-0275 or (419) 467-5742.

Best Regards,

James A Howell, President
Logan Creek Construction Co.

/lls

**AUTHORIZATION:**

_____                    _____
Craig Stambaugh                                                     Date

29

**EXHIBIT D**

**REQUIREMENTS FOR SUBSTANTIAL COMPLETION**

**AS OF DECEMBER 31, 2021**

- o Building is enclosed and secure

- o Dock doors are fully operational

- o Sprinkler system is operational, but pending final certifications

- o 1200 AMPS of power available in the building and available to tenant

- o Building mechanical room, for essential building systems, is complete and operational

- o Lighting completed in manufacturing / warehouse space per spec.

- o Floor is cured and capable to handle design load for machinery and crane system

- o Parking lot including shipping / receiving area completed

- o Restrooms operational

- o Office, breakroom approximately 70% complete

Exhibit "B"

# NAI Harmon Group

COMMERCIAL REAL ESTATE SERVICES, WORLDWIDE

This Tenant improvement summary dated July 18, 2022 relates to the Lease Agreement entered into by and between Commerce Drive Holding One LLC, an Ohio limited liability company ("Landlord"), and Apackaging Group, LLC, a California limited liability company ("Tenant") dated August 30, 2021. The Lease Commencement date is August 1, 2022.

Section 53 of the lease requires:

Landlord shall complete on behalf of Tenant the work listed on Exhibit C, '"Landlord's Work"), with a total cost not to exceed $2,412,850.00 ("Tl Cost"). Any costs over and above $2,412,850.00 shall be at the immediate cost of Tenant.

The following table summarizes the actual final cost of all Tenant Improvements as originally estimated on Exhibit C in July of 2021.

| Line item | Budget | | Final | Notes |
|---|---|---|---|---|
| Natural gas Generator | 78,000.00 | | 93,500.00 | |
| Piers for Crane | 45,700.00 | | 85,195.00 | Redesigned Crane and footers got bigger and more numerous |
| Silo Slab | 148,150.00 | | 130,638.00 | |
| Change Floor slab to 7" Thick | - | | 138,298.00 | Change Order |
| Office buildout | 1,080,000.00 | | 1,104,896.00 | |
| Exterior car parking | 220,000.00 | | 260,333.00 | |
| Interior Wall buildout | 231,000.00 | | - | Eliminated |
| Air conditioning Manufacturing space | 330,000.00 | | 461,685.00 | Increased requirement to maintain at 70 degrees |
| Transformer | 280,000.00 | | 280,000.00 | |
| Permits/ fees for above | | | 73,862.00 | Related to re-design the above |
| **Total Project cost** | **2,412,850.00** | | **2,628,407.00** | |
| Total Overage | | | 215,557.00 | 8.9% of Total project cost |
| Amount Paid by Landlord | | | $55,833.00 | Generator and parking Lot |
| Amount Paid by Tenant | | | $159,724.00 | Remaining Overage |

Accordingly, Landlord will invoice Tenant for the overage amount of $159,724.00 of the total cost of $2,628,407 in total tenant improvements. When the rent commences on October 1, 2022 the surcharge of $2.03 per square foot annually will result in additional charge of $13,533.33 per month.

In addition, The Tenant will also be responsible for paying Landlord $160,000.00 on September 1, 2024 and $500,000.00 as soon as Tenant receives its Jobs Ohio Grant but not later than January 31, 2024.

IN WITNESS WHEREOF, the Parties have executed this Tenant Improvement Agreement Dated as of __ July, 2022.

**LANDLORD:**

**TENANT:**

**Commerce Drive Holding One LLC,**
an Ohio limited liability company

**Apackaging Group, LLC**
a California limited liability company

Name: _Stephen Homer_

Name:_____

Title: _Member_

Title:_____

Date: _10/11/2022_

Date:_____

Exhibit "C"



# Purchase Order

**APACKAGING GROUP LLC**

1350 Mountain View Circle
Azusa, CA 91702

| Date | P.O. No. |
|------|----------|
| 11/22/2021 | 358098 |

| Vendor | Ship To |
|--------|---------|
| Logan Creek Construction Co<br>Lori Smith<br>4209 Corduroy Rd.,<br>Oregon, OH 43616 | 25925 Commerce Dr<br>Defiance, OH 43512 |

| Terms | Ship Via |
|-------|----------|
| Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| Plant Power Distribution and Equipment Connections<br><br>Electrical SOW per proposal revised October 28, 2021 | 1 | 1,033,384.00 | 1,033,384.00 |
| **Total** | | | $1,033,384.00 |



October 28, 2021

William Ngyuen
1350 Mountain View Circle
Azusa, CA 91702

RE: Defiance Harmon Spec/APG – Plant Power Distribution and Equipment Connections - **REVISED**
    25925 Commerce Drive
    Defiance, OH 43512

Dear William,

Logan Creek Construction Co. is pleased to resubmit this proposal with the revisions per your request, for the Plant Power Distribution and Equipment Connections. This includes all labor and materials as follows:

## GENERAL CONDITIONS:
### Main Power and Distributions:
1). Install a single 277/480v panel rated at 3000a with a snivel 3000a gfci breaker to feed bus duct.
2). 245' of Equipment power distribution bus duct rated at 277/480v-4w-3000a bus duct to include all bus plugs for equipment listed below.  Bus ducts to hang on fabricated rack that will be located between molding equipment on 10' intervals, rack to be furnished and installed by others.
3). Provide power to and install 600a SDP assembly loads panel. Fed from this panel also install a 75kva transformer with a 200a – 120/208v panel to support 120/208v loads in that area of the building.
4). Provide power to and install 800a SDP Mech loads panel.  Fed from this panel also install a 75kva transformer with a 200a – 120/208v panel to support 120/208v loads in the mechanical room vicinity of the building.

### Equipment Power Bus duct:
1). Provide 480v – 120a feeders from the bus duct to 32 identical mold machines.  Conduits to be supported on fabricated racks installed by others, racks to be used for process piping and electrical conduit supports.
2). Provide 480v – 60a feeders from the bus duct to 32 identical hot runner controllers, install (1) 45kva transformer mounted on the floor at each mold machine to product 230v – 3phase as required for each controller.  Make 230v connection to controller.
3). Provide 480v – 60a circuits from bus duct to 6 identical vacuum pumps at east end of building.
4). (2) 10-ton bridge cranes.  Provide 480v – 30a power.

### Equipment Power-Assembly Loads Panel:
| | |
|---|---|
| 1). Foamer assembly automation #1 | 480v-50a |
| 2). Foamer assembly automation #2 | 480v-50a |
| 3). Lotion assembly automation #1 | 480v-50a |
| 4). Foamer hot stamp automation#1 | 480v-50a |
| 5). Lotion hot stamp automation #1 | 480v-50a |
| 6). 10kva frequency convertors total of (3) | 480v-20a |
| 7). Material unloading pump exterior of building | 480v-60a |
| 8). Low speed automation modules with transformers, total of (6) | 220v – 1 phase – 41.6a |

### Equipment power – Mechanical Loads Panel
| | |
|---|---|
| 1). 100hp sir compressors total of (2) | 480v-200a |
| 2). 120 ton air cooled chiller | 480v-250a |
| 3). Air condenser power | 480v-60a |
| 4). Refrigerated dryers total of (2) | 480v-30a |

**TOTAL: $1,033,384.00**

**Note:**

1). There was a meeting with Randy Gardner on 10/22/21.  At the time of this meeting, we verified the power equipment as noted above.  It is likely as engineering progresses; additional equipment may be added and will be priced at that time.

If this proposal meets your approval, please indicate by signing below and returning to us via email to lsmith@logancreekcc.com  Please call me with any questions at (419) 697-0275 or (419) 467-5742.

Best Regards,

James A Howell, President
Logan Creek Construction Co.

/lls
Cc: John Allen

**AUTHORIZATION:**

William Nguyen

4 Nov 2021
Date



**APACKAGING GROUP LLC**

1350 Mountain View Circle
Azusa, CA 91702

# Purchase Order

| Date | P.O. No. |
|------|----------|
| 1/7/2022 | 358188 |

| Vendor |
|--------|
| Logan Creek Construction Co
Lori Smith
4209 Corduroy Rd.,
Oregon, OH 43616 |

| Ship To |
|---------|
| Apackaging Group LLC
1350 Mountain View Cirle
Azusa CA 91702 |

| Terms | Ship Via |
|-------|----------|
| Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| Process Piping & Electrical Support Framing including labor and materials per Permit Drawings dated 11/30/21 | 1 | 182,852.30 | 182,852.30 |

| | | **Total** | $182,852.30 |



December 29, 2021

William Ngyuen
1350 Mountain View Circle
Azusa, CA 91702

RE: Defiance Harmon Spec/APG – Process Piping & Electrical Support Framing
25925 Commerce Drive
Defiance, OH 43512

Dear William,

Logan Creek Construction Co. is pleased to submit this proposal per your request, for the Process Piping & Electrical Support Framing. This includes all labor and materials as follows:

**GENERAL CONDITIONS:**
We propose to provide all shop drawings, fabrication, delivery, and erection of the following steel:
1. 32 Columns.
2. 16 Beams at Columns.
3. 53 Perimeter Channels (bolted).
4. 148 Infill Channels.
5. 24 Filed welded diagonal angles.

**TOTAL: $182,852.30**

**Note:**
1. NO Grout, overtime costs, finish painting or inspection costs.
2. All steel to be delivered with one coat of shop grey primer.

If this proposal meets your approval, please indicate by signing below and returning to us via email to lsmith@logancreekcc.com  Please call me with any questions at (419) 697-0275 or (419) 467-5742.

Best Regards,

*James A. Howell*

James A Howell, President
Logan Creek Construction Co.

/mrg

**AUTHORIZATION:**

_____     6 January 2022
William Ngyuen                                               Date



# Purchase Order

**APACKAGING GROUP LLC**

1350 Mountain View Circle
Azusa, CA 91702

| Date | P.O. No. |
|------|----------|
| 2/21/2022 | 358276 |

| Vendor | Ship To |
|--------|---------|
| Logan Creek Construction Co<br>Lori Smith<br>4209 Corduroy Rd.,<br>Oregon, OH 43616 | Defiance Plant<br>25925 Commerce Dr<br>Defiance, OH 43512 |

| Terms | Ship Via |
|-------|----------|
| Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| Expedited Electrical Gear For Defiance Plant<br>Labor and Materials for 3000 Amp switchboard | 1 | 70,790.36 | 70,790.36 |

| | **Total** | | $70,790.36 |



**APACKAGING GROUP LLC**

1350 Mountain View Circle

Azusa, CA 91702

# Purchase Order

| Date | P.O. No. |
|------|----------|
| 3/23/2022 | 358363 |

| Vendor | Ship To |
|--------|---------|
| Logan Creek Construction Co<br>Lori Smith<br>4209 Corduroy Rd.,<br>Oregon, OH 43616 | Defiance Plant<br>25925 Commerce Dr<br>Defiance, OH 43512 |

| Terms | Ship Via |
|-------|----------|
| Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| Data Cabling and Wifi for Defiance Plant | | | |
| Office Data Cabling | 1 | 53,040.90 | 53,040.90 |
| Warehouse IDFs | 1 | 34,974.50 | 34,974.50 |
| Northwest Provided Unmanaged WIFIs | 1 | 7,327.82 | 7,327.82 |
| Northwest Provided Managed WIFIs | 1 | 14,350.80 | 14,350.80 |
| Electric Strikes and Install | 1 | 7,150.00 | 7,150.00 |

| | **Total** | $116,844.02 |
|--|-----------|-------------|



March 16, 2022

William Ngyuen
1350 Mountain View Circle
Azusa, CA 91702

RE: Defiance Harmon Spec/APG – Data Cabling
     25925 Commerce Drive
     Defiance, OH 43512

Dear William,

Logan Creek Construction Co. is pleased to submit this proposal per your request, for the Data Cabling. This includes all labor and materials as follows:

**GENERAL CONDITIONS:**
We propose to provide labor and material for the following:
**Office Data Cabling:**
1. Install (1) New 7' Relay rack with all CAT 6 Patch panels for new station cabling.
2. Install New Cat 32 J-Hook pathway for new CAT 6 cabling installation.
3. Install (2) New CAT 6 Cables per workstation.
4. Install (1) New Cat 6 Cable per wall phone location.
5. Install (3) New customers provided TV's, mounts, and blocking in walls by others.
6. Install (5) New CAT 6 Cables for new WIFI locations.
TOTAL: 111 New CAT 6 Cables
NOTE: This price includes the installation of customer provide WIFI's          **TOTAL: $53,040.90**

**Warehouse IDF's:**
1. Install (2) New 19U lockable cabinets with fan kits.
2. Install (12) strand armored from MDF to each of the (2) new IDF out in the warehouse.
3. Install (1) New 48 Port CAT 6 Patch panel in each new IDF.
4. Install (9) New CAT 6 Cables throughout the warehouse for new WIFI locations.
5. Install New CAT 32 Pathway for all new fiber and CAT 6 cabling.
NOTE: 1.) This price includes the installation of customer provided WIFI's.
           2.) Includes grounding & 120V circuits to each IDF.          **TOTAL: $34,974.50**

**Northwest Provided Unmanaged WIFI's:**
1. Supply (14) New UBIQUITI UNFI UAP-NANOHD IEEE 802.11AC 1.73 GBIT/S wireless access point.
2. Supply (3) New 24 port manageable switches (2) layer supported modular 2 SFP slots – optical fiber-twisted pair –
   1U high – rack – mountable, desktop. 1 Year Limited Warranty.
3. Supply (3) Cyber-power Smart APPLCD UPS System-700VA/400W, 120 VAC, NEMA5-15P, 1U, Rackmount,
   (6) outlets, LCD, Power-panel, with 3 Year Warranty.
4. Configuration of WIFI's and Network switches provided. This is to just get the WIFI's and the switches to talk
   to each other.          **TOTAL: $7,327.82**

**Northwest Provided Managed WIFI's:**
1. Provide (14) New UBIQUITI NANO Wireless access points – includes helpdesk, support and firmware upgrades. 3 Year Warranty.
2. Provide (3) Managed UBIQUITI 24-Port Poe network switch. Includes helpdesk, support and firmware upgrades. 3 Year Warranty.
3. Supply (3) New Cyber-power Smart APP LCD UPS System. 700VA/400W, 120 VAC, NEMA 5-15P, 1U rackmount, (6) outlets, LCD, power-panel. 3 Year Warranty.
4. Configure wireless access points, configure network switches.
NOTE: This is a basic fiber and data quote . At this time there are not any specific data cables provided to any equipment other than the wall locations, 3 -TV's and WAPS.

                                                            **TOTAL: $14,350.80**

**Electric Strikes and install:**                            **TOTAL: $7,150.00**


                    **GRAND TOTAL:  $116,844.02**



If this proposal meets your approval, please indicate by signing below and returning to us via email to lsmith@logancreekcc.com   Please call me with any questions at (419) 697-0275 or (419) 467-5742.

Best Regards,

James A Howell, President
Logan Creek Construction Co.

/mrg


**AUTHORIZATION:**

William Ngyuen                          21 MAR 2022
                                        Date



# Purchase Order

**APACKAGING GROUP LLC**

1350 Mountain View Circle
Azusa, CA 91702

| Date | P.O. No. |
|------|----------|
| 3/23/2022 | 358364 |

| Vendor |
|--------|
| Logan Creek Construction Co<br>Lori Smith<br>4209 Corduroy Rd.,<br>Oregon, OH 43616 |

| Ship To |
|---------|
| Defiance Plant<br>25925 Commerce Dr<br>Defiance, OH 43512 |

| Terms | Ship Via |
|-------|----------|
| Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| Pad for Condensors for Defiance Plant<br>Condenser Pad Silo Apron | 1 | 16,582.50 | 16,582.50 |

| | **Total** | $16,582.50 |
|--|-----------|------------|



March 21, 2022

William Ngyuen
1350 Mountain View Circle
Azusa, CA 91702

RE: Defiance Harmon Spec/APG – Silo Apron
   25925 Commerce Drive
   Defiance, OH 43512

Dear William,

Logan Creek Construction Co. is pleased to submit this proposal per your request, for the Silo Apron. This includes all labor and materials as follows:

**GENERAL CONDITIONS:**
We propose to provide labor and material for the following:

**Silo Apron:**
1. 31' x 46' Silo Apron.
2. Grade dirt to proper elevation and compact as needed.
3. Place 4" limestone base.
4. Stone provided by others.
5. Form and pour 1,426 sf. of 6" thick slab w/ 6x6 8/8 w.w.m., saw and seal.
6. Strip forms and clean up.
7. Stone

Conditions:
1. No wintertime concrete or protection.
2. All excavated material to remain onsite.              **TOTAL: $16,582.500**

If this proposal meets your approval, please indicate by signing below and returning to us via email to lsmith@logancreekcc.com   Please call me with any questions at (419) 697-0275 or (419) 467-5742.

Best Regards,

James A Howell, President
Logan Creek Construction Co.

/mrg

**AUTHORIZATION:**

_____          21 MAR 2022
William Ngyuen                                  **Date**



# Purchase Order

**APACKAGING GROUP LLC**

1350 Mountain View Circle
Azusa, CA 91702

| Date | P.O. No. |
|------|----------|
| 4/8/2022 | 358411 |

| Vendor | Ship To |
|--------|---------|
| Logan Creek Construction Co<br>Lori Smith<br>4209 Corduroy Rd.,<br>Oregon, OH 43616 | Defiance Plant<br>25925 Commerce Dr<br>Defiance, OH 43512 |

| Terms | Ship Via |
|-------|----------|
| Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| CAT6 Cabling for Defiance Manufacturing<br><br>Supplier Quote from 4/7/2022<br><br>Cable Tray:<br>1. Install and supply 4"x8" Cable Tray down both sides of the processing rack down to end of the crane for CAT6 cabling.<br>2. Install and supply 4"x8" Cable Tray from end of the crane down to the IDF on column D5 for CAT6 cabling.<br>3. Install and supply (5) new 48 port CAT6 patch Panels.<br>4. Total 4"x8" Cable Tray to be provided and instlled is 650'.<br>Upgrading IDF Cabinets from 19U to a 26U to support all of the CAT6 cabling down the processing line and any future cabling.<br>Notes: Northwest to supply man lift for installation of new Cable Tray. | 1 | 14,082.45 | 14,082.45 |

| | **Total** | $14,082.45 |
|---|---|---|



April 7, 2022

William Ngyuen
1350 Mountain View Circle
Azusa, CA 91702

RE: Defiance Harmon Spec/APG – Cable Tray
      25925 Commerce Drive
      Defiance, OH 43512

Dear William,

Logan Creek Construction Co. is pleased to submit this proposal per your request, for the Cable Tray. This includes all labor and materials as follows:

**GENERAL CONDITIONS:**
We propose to provide labor and material for the following:

**Cable Tray:**
1. Install and supply 4"x8" Cable Tray down both sides of the processing rack down to end of the Crane for CAT6 cabling.
2. Install and supply 4"x8" Cable Tray from end of the crane down to the IDF on column D5 for CAT6 cabling.
3. Install and supply (5) new 48 port CAT6 Patch Panels.
4. Total 4"x8" Cable Tray to be provided and installed is 650'.
5. Recommend upgrading IDF Cabinets from a 19U to a 26U to support all the CAT6 cabling down in the processing line and any future cabling.

NOTES; Northwest to supply man lift for installation of new Cable Tray.

**TOTAL: $14,082.45**

If this proposal meets your approval, please indicate by signing below and returning to us via email to lsmith@logancreekcc.com   Please call me with any questions at (419) 697-0275 or (419) 467-5742.

Best Regards,

*James A. Howell*
James A Howell, President
Logan Creek Construction Co.

/mrg

**AUTHORIZATION:**

_____          **7 APR 2022**
**William Ngyuen**                                   **Date**



**APACKAGING GROUP LLC**

1350 Mountain View Circle

Azusa, CA 91702

# Purchase Order

| Date | P.O. No. |
|------|----------|
| 5/18/2022 | 358539 |

| Vendor | Ship To |
|--------|---------|
| Logan Creek Construction Co<br>Lori Smith<br>4209 Corduroy Rd.,<br>Oregon, OH 43616 | 25925 Commerce Dr<br>Defiance, OH 43512 |

| Terms | Ship Via |
|-------|----------|
| Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| Silo Electrical Work<br><br>1. Install RS458 Cable in 3/4 RGS to top of four silos for continuous level sensors one per silo. This is fed from the C100-R inventory controller - Includes 110V power to power supply.<br><br>2. Install Silo: Level Monitoring Panel. Provide 110 pwer. Install horn on exterior of building. Install five conductors to high level and low-level sensors. One each per silo. All wiring is in GRS.<br><br>3. Install truck fill alarm panel - there are (2) of these panels - one mounts inside and one mount outside of the building. Includes 110-volt power to four universal alarm panel 1-4. This wiring will be EMT.<br><br>4. Install 110-volt power to four universal alarm panels 1-4. This wiring will be EMT.<br><br>5. All panels and sensors provided by others - any work on drawings and not listed is by others.<br><br>6. Includes cost for 85' lift rental. | 1 | 34,556.50 | 34,556.50 |

| | **Total** | $34,556.50 |
|--|-----------|------------|



May 17, 2022

William Ngyuen
1350 Mountain View Circle
Azusa, CA 91702

RE: Defiance Harmon Spec/APG – Silo Electrical Work
    25925 Commerce Drive
    Defiance, OH 43512

Dear William,

Logan Creek Construction Co. is pleased to submit this proposal per your request, for the Silo Electrical Work.

**GENERAL CONDITIONS:**
We propose to install and supply all labor and material for the following:

The following is based on the Provided Silo Drawings:
**Silo Electrical Work:**
1. Install RS458 Cable in ¾ RGS to top of four silos for continuous level sensors on per silo. This is feed from the C100-R inventory controller – Includes 110V power to power supply.
2. Install Silo: Level Monitoring Panel. Provide 110 power. Install horn on exterior of building. Install five conductors to high level and low-level sensors. – One each per silo. All wiring is in GRS.
3. Install truck fill alarm panel – there are (2) of these panels – one mounts inside, and one mounts outside of the building. Includes 110-volt power. Install 3 #18 conductors to sensors in 4" in 4" fill tubes – all conduit to be GRS.
4. Install 110-volt power to four universal alarm panels 1-4. This wiring will be EMT.
5. All panels and sensors provided by others – any work on drawings and not listed is by others.
6. Includes cost for 85' lift rental.

**TOTAL: $34,556.50**

If this proposal meets your approval, please indicate by signing below and returning to us via email to lsmith@logancreekcc.com  Please call me with any questions at (419) 697-0275 or (419) 467-5742.

Best Regards,

James A Howell, President
Logan Creek Construction Co.

/mrg

**AUTHORIZATION:**

_____          19 MAY 2022
William Ngyuen                              Date



**APACKAGING GROUP LLC**

1350 Mountain View Circle
Azusa, CA 91702

# Purchase Order

| Date | P.O. No. |
|------|----------|
| 5/18/2022 | 358540 |

| Vendor |
|--------|
| Logan Creek Construction Co<br>Lori Smith<br>4209 Corduroy Rd.,<br>Oregon, OH 43616 |

| Ship To |
|---------|
| 25925 Commerce Dr<br>Defiance, OH 43512 |

| Terms | Ship Via |
|-------|----------|
| Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| 110V Outlets for Molding | | | |
| 1. Install Owner provided 200 AMP MCB Panel. | 1 | 25,311.00 | 25,311.00 |
| 2. Install Owner provided 75 KVA Transformer | | | |
| 3. Panel and Transformer will be fed from 200 Amp Buss Plug. | | | |
| 4. Install 36 Quad outlets on equipment racks. | | | |
| 5. (2) Quads will be on one circuit for a total of (18) circuits. | | | |
| 6. All wiring will be completed in EMT. | | | |

| | **Total** | $25,311.00 |
|--|-----------|------------|



May 17, 2022

William Ngyuen
1350 Mountain View Circle
Azusa, CA 91702

RE: Defiance Harmon Spec/APG – 110 Outlets
     25925 Commerce Drive
     Defiance, OH 43512

Dear William,

Logan Creek Construction Co. is pleased to submit this proposal per your request, for the 110 Outlets.

**GENERAL CONDITIONS:**
We propose to install and supply all labor and material for the following:

**110 Outlets:**
1. Install Owner provided 200 AMP MCB panel.
2. Install Owner provided 75 KVA Transformer.
3. Panel and Transformer will be fed from 200 AMP Buss Plug.
4. Install 36 Quad outlets on equipment racks.
5. (2) Quads will be on one circuit for a total of (18) circuits.
6. All wiring will be completed in EMT.

**TOTAL: $25,311.00**

If this proposal meets your approval, please indicate by signing below and returning to us via email to
lsmith@logancreekcc.com   Please call me with any questions at (419) 697-0275 or (419) 467-5742.

Best Regards,

James A Howell, President
Logan Creek Construction Co.

/mrg

**AUTHORIZATION:**

_____         _____
William Ngyuen                                               19 MAY 2022
                                                                         **Date**



**APACKAGING GROUP LLC**

1350 Mountain View Circle
Azusa, CA 91702

# Purchase Order

| Date | P.O. No. |
|------|----------|
| 5/18/2022 | 358541 |

| Vendor |
|--------|
| Logan Creek Construction Co<br>Lori Smith<br>4209 Corduroy Rd.,<br>Oregon, OH 43616 |

| Ship To |
|---------|
| 25925 Commerce Dr<br>Defiance, OH 43512 |

| Terms | Ship Via |
|-------|----------|
| Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| Production Data Cabling<br><br>1. Install 4 CAT6 Data Cables at 36 locations for a total of 144 CAT6 Cables.<br><br>2. All Locations will be installed on racks with back box and conduit to cable tray<br><br>3. All cables will be tested and certified<br><br>4. Patch cables from Jacks are by APG once length have been determined. | 1 | 38,491.20 | 38,491.20 |

| | **Total** | $38,491.20 |
|--|-----------|-----------|



May 16, 2022

William Ngyuen
1350 Mountain View Circle
Azusa, CA 91702

RE: Defiance Harmon Spec/APG – Production Data Cables
    25925 Commerce Drive
    Defiance, OH 43512

Dear William,

Logan Creek Construction Co. is pleased to submit this proposal per your request, for the Production Data Cables.

**GENERAL CONDITIONS:**
We propose to install and supply all labor and material for the following:

**Production Data Cables:**
1. Install 4 CAT 6 Data Cables at 36 locations for a total of 144 CAT 6 Cables.
2. All locations will be installed on racks with back box and conduit to cable tray.
3. All cables will be tested and certified.
4. Patch cables from Jacks are by APG once lengths have been determined.

**TOTAL: $38,491.20**

If this proposal meets your approval, please indicate by signing below and returning to us via email to lsmith@logancreekcc.com   Please call me with any questions at (419) 697-0275 or (419) 467-5742.

Best Regards,

*James A. Howell*

James A Howell, President
Logan Creek Construction Co.

/mrg

**AUTHORIZATION:**

_____         19 MAY 2022
**William Ngyuen**                           _____
                                                              **Date**



**APACKAGING GROUP LLC**

1350 Mountain View Circle
Azusa, CA 91702

# Purchase Order

| Date | P.O. No. |
|------|----------|
| 5/19/2022 | 358571 |

| Vendor | Ship To |
|--------|---------|
| Logan Creek Construction Co<br>Lori Smith<br>4209 Corduroy Rd.,<br>Oregon, OH 43616 | 25925 Commerce Dr<br>Defiance, OH 43512 |

| Terms | Ship Via |
|-------|----------|
| Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| Additional Buss and Buss Plugs | | | |
| 1. Install 210' of new 3000 Amp Buss Way. | 1 | 703,045.20 | 703,045.20 |
| 2. Provide and install the following quantity of Buss Plugs and Feeders: | | | |
| A. 76 - 30 amp Buss Plugs. | | | |
| B. 13 - 60 amp Buss plugs. | | | |
| C. 6 - 200 Amp Buss Plugs. | | | |
| D. 24 - 400 Amp Buss Plugs. | | | |
| 3. All Buss Plugs include fuses and feeders connected to equipment | | | |
| 4. The above list of Buss Plugs is based on the third list of equipment provided and is in addition to the original quoted list of equipment. | | | |
| 5. This quote DOES NOT INCLUDE the feeder to this New Buss - The Feeder will be included with the quote for the additional service. | | | |
| 6. This quote DOES NOT INCLUDE tany 100 volt Equipment Power as these locations have yet to be provided. | | | |

| | **Total** | $703,045.20 |
|--|-----------|-------------|



# Purchase Order

**APACKAGING GROUP LLC**

1350 Mountain View Circle
Azusa, CA 91702

| Date | P.O. No. |
| --- | --- |
| 6/7/2022 | 358613 |

| Vendor | Ship To |
| --- | --- |
| Logan Creek Construction Co<br>Lori Smith<br>4209 Corduroy Rd.,<br>Oregon, OH 43616 | 25925 Commerce Dr<br>Defiance, OH 435122 |

| Terms | Ship Via |
| --- | --- |
| Net 30 | |

| Description | Qty | Rate | Amount |
| --- | --- | --- | --- |
| SUPPLIER QUOTE #Additional 3000 Amp Service<br>Defiance additional Buss and Buss Plugs<br><br>1. Install New 12470 Volt Line Extension on one new power pole.<br>2. Install one new 4" Conduit with 15KVA Conductors from new pole to new transformer pad.<br>3. Install new transformer pad.<br>4. Provide and install reconditioned 2500KVA 12470/480 Volt Transformer.<br>5. New Primary Cable will be high pot tested.<br>6. This work will require One Day Max Power Outage.<br>7. Install (8) sets of secondary Conduits with feeder wire.<br>8. Floor will be cut to enable installing (8) conduits with feeders to new 3000 AMP bussway. This will be done from underground like first bussway as new buss is mounted below existing buss.<br>9. Includes concrete cut and patch.<br>10. Projected (Provided by manufacturer) ship times for equipment included in price.<br>11. 2500 KVA Reconditioned Transformer: 12 weeks<br>12. New 3000 AMP Gear: 31 weeks from release<br>13. New Primary Pole work: 4-6 weeks | 1 | 379,109.50 | 379,109.50 |
| Alternate #1 - Alternate Gear: Chicago Electric: 8-10 weeks lead time | 1 | 65,948.30 | 65,948.30 |

| | **Total** | $445,057.80 |
| --- | --- | --- |



**APACKAGING GROUP LLC**

1350 Mountain View Circle
Azusa, CA 91702

# Purchase Order

| Date | P.O. No. |
|------|----------|
| 7/25/2022 | 358795 |

| Vendor |
|--------|
| Logan Creek Construction Co |
| Lori Smith |
| 4209 Corduroy Rd., |
| Oregon, OH 43616 |

| Ship To |
|---------|
| 25925 Commerce Dr |
| Defiance, OH 43512 |

| Terms | Ship Via |
|-------|----------|
| Net 30 | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| Pump Skid Feeder<br><br>1. Install New 200 AMP Breaker in SDPM.<br>2. Install 200 AMP Feeder in 2" EMT.<br>3. Install Conductors and make connections.<br>4. This is based on copper wire due to lug sizes on Pump Skid. | 1 | 9,209.20 | 9,209.20 |

| | **Total** | $9,209.20 |
|---|---|---|



May 10, 2022

William Ngyuen
1350 Mountain View Circle
Azusa, CA 91702

RE: Defiance Harmon Spec/APG – Access Control System
    25925 Commerce Drive
    Defiance, OH 43512

Dear William,

Logan Creek Construction Co. is pleased to submit this proposal per your request, for the Access Control System.

**GENERAL CONDITIONS:**
We propose to install and supply all labor and material for the following:

**Access Control System:**
1. Install Access Control System for (7) Doors.
2. Includes Power Supply.
3. Includes (7) Proximity Readers.
4. Includes Wiring.
5. Includes Software to be installed on provided PC.
6. Includes 100 cards.
7. Includes single side card printer with software.
8. One training session will be provided.
9. Strikes are by others.

**TOTAL: $34,574.10**

If this proposal meets your approval, please indicate by signing below and returning to us via email to lsmith@logancreekcc.com   Please call me with any questions at (419) 697-0275 or (419) 467-5742.

Best Regards,

James A Howell, President
Logan Creek Construction Co.

/mrg

**AUTHORIZATION:**

_____          _____
**William Ngyuen**                                                **Date**

**Lori Smith**

| | |
|---|---|
| **From:** | Scott Smiddy <ssmiddy@apackgroup.com> |
| **Sent:** | Friday, May 13, 2022 11:11 AM |
| **To:** | Lori Smith |
| **Cc:** | William Nguyen |
| **Subject:** | RE: Proposal for Access Control System |

Lori,

At this time we are holding off. I spoke with Jim on what is needed and will need a revised quote.

-----Original Message-----
From: Lori Smith <lsmith@logancreekcc.com>
Sent: Thursday, May 12, 2022 1:15 PM
To: Scott Smiddy <ssmiddy@apackgroup.com>
Subject: Proposal for Access Control System

Scott-
Attached is the proposal that was sent to William for his authorization.

Best Regards,

Lori Smith, Business Manager
Logan Creek Construction Co.
4209 Corduroy Rd.
Oregon, OH 43616
Office:(419) 697-0275  Fax: (419) 697-0286

-----Original Message-----
From: LCC Copier <copier@logancreekcc.com>
Sent: Thursday, May 12, 2022 1:12 PM
To: Lori Smith <lsmith@logancreekcc.com>
Subject: Scan Image from Lori's Office L5594

This E-mail was sent from "LoriOfficeL5594" (IM C2500).

Scan Date: 05.12.2022 13:11:54 (-0400)
Queries to: copier@logancreekcc.com

1

1/20/23, 10:37 AM
Imaging - View Transaction

Exhibit "D"



THIS DOCUMENT IS PROTECTED BY INVISIBLE FIBERS AND CHEMICALLY REACTIVE PAPER. HOLD TO LIGHT TO VERIFY A TRUE WATERMARK.

Commerce Drive Holding One LLC
4427 Talmadge Rd
Suite A
Toledo, OH 43623

F&M Bank
5520 Monroe St
Sylvania, OH 43560

144

Date:  11/28/2022

Pay to the
order of:   **LOGAN CREEK CONSTRUCTION COMPANY**

This amount: •••• SEVEN HUNDRED THOUSAND AND 00/100 DOLLARS

$700,000.00

Logan Creek Construction Company
4209 Corduroy Rd
Oregon, OH 43616

MEMO   APG Reimbursement from Landlord

ENDORSE HERE:
X    FOR DEPOSIT ONLY

CHECK HERE IF MOBILE DEPOSIT
DO NOT SIGN / WRITE / STAMP BELOW THIS LINE
FOR FINANCIAL INSTITUTION USAGE ONLY
PREMIER BANK

NOV 2 8 2022
Branch #55  Teller #003
SYLVANIA

1/20/23, 10:38 AM                                    Imaging - View Transaction                    Exhibit "D"

Commerce Drive Holding One LLC          F&M Bank                              146
4427 Talmadge Rd                        5520 Monroe St
Suite A                                 Sylvania, OH 43560           Date:    12/20/2022
Toledo. OH 43623

Pay to the
order of:     **LOGAN CREEK CONSTRUCTION COMPANY**
This amount: ···· ONE HUNDRED SIXTY-ONE THOUSAND, ONE HUNDRED SEVENTEEN AND 16/100 DOLLARS   **$161,117.16**

Logan Creek Construction Company
4209 Corduroy Rd
Oregon, OH 43616

MEMO  APG Reimbursement from Landlord ...                       *Bailey Slinger*

PREMIER BANK
Branch #55  Teller
DEC 27 2022
SYLVANIA
001

For Deposit Only

1119 ADAMS STREET, LOWER
TOLEDO, OH 43604
419.724.3499 P
419.724.3495 F

MOCKLTD.COM



**Exhibit "E"**

December 14, 2022

**Via Priority Mail**

Apackaging Group, LLC
1350 Mountain View Circle
Azusa, California 91702

With a copy to:

Gordon Ress Scully Mansukhani, LLP
275 Battery St., Suite 2000
San Francisco, California 94111
Attention: Mark Posard

> Re: **NOTICE OF DEFAULT OF LEASE - Commercial Lease (the "Lease") between Commerce Drive Holding One, LLC an Ohio limited liability company ("Landlord") and Apackaging Group, LLC, ("Tenant"), for the property located at 25925 Commerce Dr., Defiance, Ohio 43512 (the "Property").**

To Whom It May Concern,

Please allow this letter to serve as formal notice that Apackaging Group, LLC is in default under Section 25 (a) of the above reference Lease for failure to timely pay reimbursements due to Landlord. As Tenant is aware, Tenant contracted with Logan Creek Construction to complete the improvements at the property. After numerous demands for payment on the outstanding work orders of Logan Creek Construction, Tenant failed to pay those work orders totaling $861,117.16. Due to Tenant's failure to pay the outstanding work orders, Landlord has stepped in to pay the outstanding balance pursuant to Section 19 of the Lease to prevent mechanics liens from encumbering title to the building. Landlord has demanded reimbursement of these costs from Tenant and Tenant has failed to pay.

Further, pursuant to the Lease Agreement, Landlord is also entitled to reimbursements from Tenant for Tenant Improvement overages that were incurred by Landlord. Tenant incurred known Tenant Improvement overages of $159,724.00 as documented in the Tenant Improvement Summary dated July 18, 2022. Pursuant to the Lease, this overage was due immediately upon demand by Landlord. Tenant has failed to reimburse Landlord as required by the Lease.

In total, Tenant now owes Landlord $1,020,841.16 for which demand for payment has already been made. Landlord demands payment of $1,020,841.16 by December 20, 2022. If the total balance due has not been paid by December 20, 2022, Landlord shall consider Tenant in default without further opportunity to cure.

IRS REPRESENTATION
BUSINESS, PROBATE, BANKRUPTCY AND ESTATE PLANNING

December 14, 2022
Page 2 of 2

Landlord reserves all rights and remedies available to it under the Lease. We hope that this issue will be dealt with in a timely and professional manner. Only full payment of the past-due balance will cure this default. I am happy to discuss this issue further if you have any questions. I can be reached at 419-724-3499 or brandon@mockltd.com.

Respectfully,

Brandon M. Rehkopf, Esq.

## 23-CV-46043 COMMERCE DRIVE HOLDING ONE LLC vs APACKAGING GROUP, LLC

- Case Type:
- CIVIL
- Case Status:
- OPEN
- File Date:
- 01/23/2023
- Action:
- OTHER CIVIL
- Status Date:
- 01/23/2023
- Case Judge:
- SCHMENK, JOSEPH N
- Next Event:
- 

| All Information | Party | Service Records | **Docket** | Financial | Receipt | Disposition |

### Docket Information

| Date | Docket Text | Amount Owed | File Ref Nbr. | Amount Due | Image Avail. |
|------|-------------|-------------|---------------|------------|--------------|
| 01/23/2023 | CIVIL DEPOSIT Receipt: 167182 Date: 01/23/2023 | $255.00 | | $0.00 | |
| 01/23/2023 | CIVIL COMPLAINT FILED 01/23/2023 02:47 PM Attorney: URTZ, KEVIN Receipt: 167182 Date: 01/23/2023 | $95.00 | | $0.00 | Image |
| 01/23/2023 | CERTIFIED MAIL ISSUED Issue Date: 01/23/2023 Service: SUMMONS ON COMPLAINT Method: CERTIFIED MAILER<br><br>APACKAGING GROUP, LLC BUSINESS ADDRESS C/O HELGA ARMINAK, REGISTERED AGENT 1350 MOUNTAIN VIEW CIRCLE AZUSA, CA  91702 Tracking Number: 9414726699042196449897 | $2.00 | | $2.00 | |
| 01/23/2023 | POSTAGE | $12.40 | | $12.40 | |

## 23-CV-46043 COMMERCE DRIVE HOLDING ONE LLC vs APACKAGING GROUP, LLC

- Case Type:
- CIVIL
- Case Status:
- OPEN
- File Date:
- 01/23/2023
- Action:
- OTHER CIVIL
- Status Date:
- 01/23/2023
- Case Judge:
- SCHMENK, JOSEPH N
- Next Event:
-

| All Information | Party | Service Records | Docket | Financial | Receipt | Disposition |

### Service Records

| Issue Date | Party Served | Tracking Number | Service Method | Status | Service Date |
|---|---|---|---|---|---|
| 01/23/2023 | APACKAGING GROUP, LLC<br>C/O HELGA ARMINAK, REGISTERED AGENT<br>1350 MOUNTAIN VIEW CIRCLE<br>AZUSA,  CA  91702 | 9414726699042196449897 | CERTIFIED MAILER | | |